# IN THE SUPREME COURT OF TEXAS

════════════
No. 15-0569
════════════

BP AMERICA PRODUCTION COMPANY, PETITIONER,

v.

RED DEER RESOURCES, LLC, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued January 12, 2017**

JUSTICE GREEN delivered the opinion of the Court.

In this case, we must determine whether a jury's finding that a gas well was incapable of production in paying quantities the day after the producer closed the valve, and eight days after the last gas was sold or used, can support a judgment terminating the producer's lease in its secondary term. Because we conclude that the top-lease holder did not obtain a finding that the well was incapable of production in paying quantities on the material date under the plain language of the lease, we hold that the producer's lease remains valid without reaching the parties' other issues. Accordingly, we reverse the judgment of the court of appeals and render judgment in the producer's favor.

# I. Background

This case involves the shutting-in of the Vera Murray #11 gas well. BP America Production Company owns an oil and gas lease covering approximately 2,113 acres in Lipscomb and Hemphill Counties, Texas (the Vera Murray lease). The lease originated in 1962, and BP has owned and operated the lease since 2000. The lease has a five-year primary term and lasts "as long thereafter as oil, gas or other minerals is produced." In 1986, the lessee drilled three wells in the Upper Morrow formation—the Vera Murray #9, #10, and #11. The three wells initially produced oil but were reclassified as gas wells in 1989. The #9 well was plugged in April 2009, and the parties stipulated at trial that the #10 well (which was plugged in June 2012) was not capable of production in paying quantities without additional equipment or repairs on June 12, 2012—the date BP shut in the #11 well. All other previously drilled wells were plugged by 2009. Thus, only the #11 well could have sustained the lease on and after June 12, 2012.

The Vera Murray #11 was a marginal well. By 1994, production from the well was averaging about 200 Mcf per day, but that production gradually declined over the next few years, with the well having several consecutive days without any flow, followed by several days with flow. Production had declined to less than 100 Mcf per day when BP acquired the lease in 2000. By 2009, production had declined to less than 10 Mcf per day.

Red Deer Resources, LLC discovered the low production from the Vera Murray lease and obtained top leases in June 2011. The top leases contain an assignment provision giving Red Deer the right to file suit to terminate BP's lease. In July 2011, Red Deer notified BP of its top leases, asserting that BP's wells were "non-commercial."

2

In May 2012, the #11 well experienced a seven-day period with no production. In the following days, the well resumed a general pattern of flowing gas for a period of time every other day.[1] The well produced 10 Mcf of gas on June 4, 2012, but then went eight days with no production. On June 12, BP turned off the well valve. On June 13, BP sent notice to the lessors that it was invoking the shut-in royalty clause, enclosing checks for the shut-in royalty owed. On the shut-in royalty checks, BP designated June 13, 2012, as the beginning of the shut-in period. The #11 well has remained shut in ever since.

BP's lease contains a sixty-day cessation-of-production clause, which states, "[I]f production . . . should cease, and this lease is not otherwise maintained in force . . . after the primary term, this lease shall not terminate if lessee commences mining, drilling, or reworking operations on or before the expiration of sixty days from . . . cessation of production." It is undisputed that the #11 well was the only well potentially capable of production in paying quantities on June 12, 2012, and that BP did not commence any production operations during the sixty days after it closed the valve to the sales line on June 12. Therefore, the lease would terminate for a total failure of production or a failure of production in paying quantities unless BP properly invoked the shut-in royalty clause to maintain it. The shut-in royalty clause reads, in relevant part:

> Where gas from any well or wells capable of producing gas . . . is not sold or used during or after the primary term and this lease is not otherwise maintained in effect, lessee may pay or tender as shut-in royalty . . . , payable annually on or before the end of each twelve month period during which such gas is not sold or used and this lease

---

[1] The #11 well is equipped with a "plunger lift" system, which allows gas production to be interrupted to permit the well to build reservoir pressure. When pressure builds to a pre-set level, the gas pushes the plunger up through the tubing, clearing liquids that hinder production and allowing a free flow of gas when the plunger reaches the wellhead. When the pressure declines as the gas is produced, the plunger falls back to the bottom, and the cycle repeats.

is not otherwise maintained in force, and if such shut-in royalty is so paid or tendered and while lessee's right to pay or tender same is accruing, it shall be considered that gas is being produced in paying quantities, and this lease shall remain in force during each twelve-month period for which shut-in royalty is so paid or tendered . . . .

Red Deer sued BP in August 2012, more than sixty days after BP shut in the #11 well, and asked the trial court to declare that BP's lease had terminated. The case was tried to a jury in 2013. Red Deer asserted two separate theories of lease termination: (1) BP's lease had terminated because the lease had not produced in paying quantities, based on a period of time ending on June 12, 2012; and (2) BP's lease terminated from an unexcused total cessation of production, and the shut-in clause did not save it because the #11 well was incapable of producing in paying quantities on June 13, 2012.[2] Four questions were submitted to the jury—Questions 1 and 2 related to Red Deer's claim that production in paying quantities had ceased by June 12, 2012, and Questions 3 and 4 were shut-in questions to determine whether the #11 well was capable of producing in paying quantities as of June 13, 2012. Questions 1 and 3, and the jury's answers, were as follows:

> Question 1: From April 27, 2009 to June 12, 2012, did the Vera Murray lease fail to produce oil and gas in paying quantities?
>
> Answer: No, the Very Murray lease did not fail to produce in paying quantities.
>
> Question 3: Was the Vera Murray #11 well incapable of producing in paying quantities when it was shut-in on June 13, 2012?
>
> Answer: Yes, the Vera Murray #11 well was incapable of producing in paying quantities when it was shut-in on June 13, 2012.

---

[2] Red Deer's second theory arose from the lease's cessation-of-production clause—a lease savings clause. Under Red Deer's theory, because of the lease's sixty-day cessation-of-production clause, coupled with the "legally ineffective" shut-in royalty payment, the lease lapsed and terminated sixty-one days after BP shut in the #11 well by its own terms, "even if the Lease had not previously lapsed due to its failure to produce in paying quantities."

4

Based on these answers, and after overruling BP's objection to entry of judgment on Questions 3 and 4, the trial court signed a judgment declaring that BP's lease had "lapsed and terminated for the lease being incapable of producing in paying quantities when the Vera Murray Well #11 was shut-in on June 13, 2012 and that a reasonably prudent operator would not continue to operate the well."

The court of appeals rejected BP's arguments and affirmed the trial court's judgment, concluding that BP could not avoid lease termination by invoking the shut-in royalty clause. 466 S.W.3d 335, 352 (Tex. App.—Amarillo 2015, pet. granted). The court of appeals upheld the jury's answer to Question 3 that the #11 well lacked the capability to produce gas in paying quantities on June 13, 2012, enabling Red Deer to enforce its top leases. *Id.* at 347. In effect, the court of appeals held that the lease could be terminated based on the jury's finding that the well was incapable of production in paying quantities the day after it was shut in. *See id.*

## II. Applicable Law

### A. Lease Construction

"Construing an unambiguous lease is a question of law for the Court. Accordingly, we review lease-construction questions de novo." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999)).[3] When construing an unambiguous lease, "our primary duty is to ascertain the parties' intent as expressed within the lease's four corners." *Id.* (citing *Luckel*, 819 S.W.2d at 461; *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 372–73

---

[3] "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

5

(Tex. 2001)). We give the lease's language its plain meaning unless doing so would clearly defeat the parties' intent. *Id.* (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)). We examine the entire lease, attempting to harmonize all of its parts, even if different parts appear contradictory or inconsistent, presuming that the parties to the lease intended every clause to have some effect. *Id.* (citing *Luckel*, 819 S.W.2d at 462; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

## B. Relevant Oil and Gas Lease Provisions

A mineral lease grants a fee simple determinable to the lessee. *Id.* (citing *Tex. Co. v. Davis*, 254 S.W. 304, 309 (Tex. 1923)). As a result, "the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose." *Id.* (citing *Davis*, 254 S.W. at 306). However, if the event upon which the mineral estate is limited occurs, then the lessee's mineral estate terminates automatically. *Id.* (citing *Gulf Oil Corp. v. Reid*, 337 S.W.2d 267, 269 (Tex. 1960)). "When a lease terminates 'is always a question of resolving the intention of the parties from the entire instrument.'" *Id.* (quoting *Gulf Oil Corp. v. Southland Royalty Co.*, 496 S.W.2d 547, 552 (Tex. 1973)).

"A lease's habendum clause defines the mineral estate's duration." *Id.* A typical habendum clause provides that the lease will remain in force during a fixed primary term and "as long thereafter as oil, gas or other minerals is produced" during the secondary term. *Id.* The word "produce" in a habendum clause "is synonymous with the phrase 'producing in paying quantities.'" *Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc.*, 861 S.W.2d 427, 432 n.4 (Tex. App.—Amarillo 1993, no writ) (quoting *Garcia v. King*, 164 S.W.2d 509, 511–12 (Tex. 1942)). "Production in paying quantities"

6

means "the production is sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid." *Id.* (citing *Garcia*, 164 S.W.2d at 511). For purposes of determining whether a marginally productive well has ceased to produce in paying quantities, profitability must be measured over a reasonable period of time under the circumstances. *See BP Am. Prod. Co. v. Laddex, Ltd.*, ___ S.W.3d ___, ___ (Tex. 2017); *Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1959).

"Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term." *Thompson*, 94 S.W.3d at 554 (citing *Southland Royalty*, 496 S.W.2d at 552). Thus, after the primary term, an oil and gas lease generally may be kept alive "by production in paying quantities, or a savings clause, such as a shut-in gas well clause, drilling operations clause, or continuous operations clause." *Tracker*, 861 S.W.2d at 432. We resolve the question of when a lease terminates by ascertaining the parties' intent from the lease as a whole. *Thompson*, 94 S.W.3d at 554 (quoting *Southland Royalty*, 496 S.W.2d at 552).

Many mineral leases contain savings clauses designed to prevent the automatic termination of the lease upon a cessation of production. For instance, a typical cessation-of-production clause provides that a lease will remain in force during the secondary term in the absence of actual production if the lessee conducts drilling or reworking operations within a fixed number of days of the original cessation of production. *See Samano v. Sun Oil Co.*, 621 S.W.2d 580, 580–81 (Tex. 1981). Similarly, "[a] shut-in royalty clause 'provides for a substitute or contractual method of production, which will maintain the lease in force and effect when a gas well is drilled and for which no market exists.'" *Tracker*, 861 S.W.2d at 432 (citing RICHARD W. HEMINGWAY, THE LAW OF OIL

7

AND GAS § 6.5, at 304 (2d ed. 1983)).  Invocation of the shut-in royalty clause "is considered constructive production and will maintain the lease if its terms are satisfied." *Id.* (citing *Archer Cty. v. Webb*, 326 S.W.2d 250, 255 (Tex. Civ. App.—El Paso 1959), *aff'd*, 338 S.W.2d 435 (Tex. 1960)). For a well to be maintained by the payment of shut-in royalties, however, the party seeking to exercise its shut-in rights must comply with the terms set out in the mineral lease.  In many cases, this means "it must be capable of producing gas in paying quantities at the time it is shut-in." *Id.* at 432–33.  Thus, when a shut-in royalty clause has been invoked, a party seeking to terminate the lease "must negate the clause by establishing that the well was either not capable of producing in paying quantities, or that no market existed for the gas, or both." *Id.* at 433.  In *Anadarko Petroleum Corp. v. Thompson*, we held that the phrase "capable of production" means that a well is "capable of producing in paying quantities without additional equipment or repairs."  94 S.W.3d at 558 (citing *Tracker*, 861 S.W.2d at 433–34 ("We believe that the phrase 'capable of production in paying quantities' means a well that will produce in paying quantities if the well is turned 'on,' and it begins flowing, without additional equipment or repair.  Conversely, a well would not be capable of producing in paying quantities if the well switch were turned 'on,' and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.")).  This determination, of course, must be made over a reasonable period of time under the circumstances. *See Laddex*, ___ S.W.3d at ___; *Koontz*, 325 S.W.2d at 691.

### III. Analysis

As explained, Red Deer asserted two theories of lease termination at trial: (1) BP's lease terminated because of a failure of production in paying quantities, measured over a period ending

June 12, 2012; and (2) BP's lease terminated because of a total cessation of production, and the shut-in clause did not save it because the #11 well was incapable of producing in paying quantities on June 13, 2012. The jury rejected Red Deer's first theory but found for Red Deer on the second.[4]

Our focus in this case is on Red Deer's second theory, under which the lease terminated due to a total cessation of production and was not saved by the shut-in clause. A total cessation of production for the number of consecutive days defined in a lease's cessation-of-production clause automatically terminates the lease, without regard to the reasonableness of the operator's actions, absent a properly invoked savings clause. *See, e.g.*, *Samano*, 621 S.W.2d at 584 ("When production stopped on May 4, 1977, during the secondary period, Sun had an express sixty days to drill or rework the well. When it failed to do so, the lease by its express terms automatically terminated."). This is a ground for lease termination separate from the cessation of production in paying quantities analysis laid out in *Clifton v. Koontz*, 325 S.W.2d 684, and *Skelly Oil Co. v. Archer*, 356 S.W.2d 774 (Tex. 1962). *See generally Laddex*, ___ S.W.3d at ___ (reiterating the framework under which claims of cessation of production in paying quantities are evaluated). Unlike claims of cessation of production in paying quantities, when a party claims that a lease terminated for total cessation of production, the reasonably-prudent-operator inquiry does not come into play. *See Bachler v. Rosenthal*, 798 S.W.2d 646, 648–50 (Tex. App.—Austin 1990, writ denied); *see also Cannon v.*

---

[4] The jury's answer to Question 1, at worst, says that Red Deer failed to prove by a preponderance of the evidence that the lease failed to produce in paying quantities from April 27, 2009, to June 12, 2012. BP argues that the jury's answer to Question 1 was an affirmative finding in its favor. Red Deer argues that it is merely a failure to find. We need not resolve this issue because, in either case, Red Deer did not obtain a finding in its favor that can support a judgment against BP. *See Little Rock Furniture Manuf. Co. v. Dunn*, 222 S.W.2d 985, 990 (Tex. 1949) (explaining that before a party is entitled to judgment in its favor, it must satisfy its burden of obtaining jury findings in its favor on every essential element of its claim).

9

*Sun–Key Oil Co., Inc.*, 117 S.W.3d 416, 421 (Tex. App.—Eastland 2003, pet. denied) ("A 'total cessation of production' occurs when a well that has been producing gas ceases to produce any quantity of gas. When there has been a 'total cessation of production,' the two-prong 'cessation of production in paying quantities' analysis does not apply."). Rather, the party claiming total cessation of production must prove that (1) there has been a total cessation of production for a period longer than that permitted in the lease's cessation-of-production savings clause; and (2) no other savings provision, such as a shut-in royalty clause, sustains the lease. *See Watson v. Rochmill*, 155 S.W.2d 783, 784 (Tex. 1941); *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 553 (Tex. App.—San Antonio 2011, no pet.); *Ridenour v. Herrington*, 47 S.W.3d 117, 122 (Tex. App.—Waco 2001, pet. denied); *see also Wainwright v. Wainwright*, 359 S.W.2d 628, 630 (Tex. Civ. App.—Fort Worth 1962, writ ref'd n.r.e.) ("The question in [*Clifton v. Koontz*] was whether production in paying quantities had ceased. In our case the question is whether all production had ceased for 90 days. The wells were producing, and in paying quantities, until appellee voluntarily discontinued operations. We do not think the holding in *Clifton v. Koontz* has application here.").

Here, the habendum clause in the Vera Murray lease provides that the lease will remain in force during the five-year primary term and "as long thereafter as oil, gas or other minerals is produced." The parties do not dispute that BP failed to commence additional drilling or reworking operations within sixty days of the well being shut in, so the cessation-of-production savings clause in the Vera Murray lease does not operate to save BP's lease. However, the parties vehemently disagree as to whether BP's invocation of the lease's shut-in royalty clause operates to prevent lease termination. According to Red Deer, because there is no dispute that the #11 well was the only well

10

that could have sustained the lease, for BP's invocation of its shut-in rights to be effective, the well must have been "capable of producing gas in paying quantities at the time it was shut-in." *Tracker*, 861 S.W.2d at 432–33. In Question 3, the jury found that the #11 well "was incapable of producing in paying quantities when it was shut-in on June 13, 2012." Thus, Red Deer argues that the Vera Murray lease terminated because the jury found that the only well capable of sustaining the lease was incapable of production in paying quantities on the day after BP physically closed the well's valve. We disagree.

As the party seeking to terminate the Vera Murray lease, Red Deer bore the burden of proving that (1) the #11 well experienced a total cessation of production for a period of at least sixty days; and (2) no savings provision, such as the shut-in royalty clause, maintained the lease during that time. *Id.* at 431–32. Thus, Red Deer had the burden to prove that BP failed to properly invoke its shut-in rights under the terms of the lease. We conclude that Red Deer failed to satisfy its burden.

The shut-in royalty clause in the Vera Murray lease preserves the lease upon payment of a negotiated annual shut-in royalty within a year after the last gas is "sold or used" from a well capable of producing gas:

> Where gas from any well or wells capable of producing gas . . . is not sold or used during or after the primary term and this lease is not otherwise maintained in effect, lessee may pay or tender as shut-in royalty . . . , payable annually on or before the end of each twelve month period during which such gas is not sold or used and this lease is not otherwise maintained in force, and if such shut-in royalty is so paid or tendered and while lessee's right to pay or tender same is accruing, it shall be considered that gas is being produced in paying quantities, and this lease shall remain in force during each twelve-month period for which shut-in royalty is so paid or tendered . . . .

Thus, under the Vera Murray lease, payment of an annual shut-in royalty within twelve months after the day gas is last sold or used constitutes production in paying quantities for that prior twelve-month period. In other words, tender of a shut-in royalty within twelve months of the last day gas is sold or used will sustain the lease through retroactive constructive production, so long as the well was capable of production in paying quantities over a reasonable period of time on the date that gas was last sold or used. Red Deer claims, and the record tends to support, that "[t]he last day that any gas from the lease was 'sold or used' was June 4."[5] Further, it is undisputed that: (1) BP turned off the valve on the #11 well on June 12, 2012; and (2) BP tendered its shut-in royalty on June 13, 2012.

At the heart of the parties' dispute is the date on which the capability of production in paying quantities determination is to be made under the Vera Murray lease. BP argues that either June 4 (the last day gas was sold or used) or June 12 (the day the valve was closed) is the proper measuring date while Red Deer argues that June 13 is the proper date as the date on which BP "invoked its shut-in rights." But the parties largely overlook the plain language of the lease, focusing instead on the date the #11 well was shut in rather than the measuring date clearly specified in the lease. That is, when a mineral lease specifies the date on which the capability of production in paying quantities determination is to be made, the parties must comply with the plain language of the lease. *See Thompson*, 94 S.W.3d at 554 ("When a lease terminates 'is always a question of resolving the

---

[5] At different points in its briefing, BP asserts that gas was last sold or used in May 2012. However, BP and Red Deer also acknowledge that the #11 well produced 10 Mcf of gas on June 2 and again on June 4 and that the well "was open to the sales line" on those dates. Thus, while the date that gas was last sold or used is not entirely clear from the record, the record supports Red Deer's assertion that gas was last sold or used on June 4, 2012, so we refer to that date in this opinion. However, the outcome in this case would be the same if we agreed with BP that the last gas was sold or used in May 2012 because Red Deer failed to obtain a finding that the #11 well was incapable of producing in paying quantities, over a reasonable period of time, as of May 2012.

12

intention of the parties from the entire instrument.'" (quoting *Southland Royalty*, 496 S.W.2d at 552)).

The parties do not argue that the shut-in royalty clause in the Vera Murray lease is ambiguous. We agree that the clause is not ambiguous. The clause provides BP the right to maintain the lease upon payment of an annual shut-in royalty within a year after the last day gas is "sold or used" from a well capable of producing gas. The operative date under the shut-in clause is the date the last gas was sold or used, not the date the shut-in royalty was paid or the date the valve was closed. Thus, contrary to Red Deer's assertion, this particular shut-in clause is not one that measures "for one year from the date of payment" or "upon such payment." *See Reid*, 337 S.W.2d at 269 n.1; *Marifarms Oil & Gas, Inc. v. Westhoff*, 802 S.W.2d 123, 125 (Tex. App.—Fort Worth 1991, no writ). Further, the clause provides that the right to preserve the lease "is accruing" for the entire twelve-month period that "gas is not sold or used." Tender of the shut-in royalty at any time "before the end of each twelve-month period during which such gas is not sold or used" preserves the lease from the last day on which gas was sold or used. In other words, the date the shut-in royalty is tendered is irrelevant so long as it is within the twelve-month period because, under the plain language of this shut-in clause, the payment relates back to the beginning of the accrual period when the last gas was sold or used. A retroactive shut-in clause, like the one here, allows the producer to shut in a well up to twelve months after production has ceased, with constructive production relating back to the date the last gas was sold or used.

The record supports that gas was last sold or used on June 4. Thus, to negate BP's invocation of its shut-in royalty rights, Red Deer bore the burden of proving that the #11 well was incapable of

13

production in paying quantities over a reasonable period of time as of June 4, 2012. However, Red Deer failed to obtain a finding that the #11 well was incapable of production in paying quantities as of that date. *See Vortt Expl. Co. v. EOG Res., Inc.*, No. 11-07-00159-CV, 2009 WL 1522661, at *6 (Tex. App.—Eastland May 29, 2009, no pet.) (mem. op.) (explaining that timely payment of shut-in royalties is a separate issue from the question of capability of production in paying quantities).

We recognize that this Court approved in *Anadarko Petroleum Corp. v. Thompson* the definition of the phrase "capable of production in paying quantities" laid out by the Court of Appeals for the Seventh District in *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.* 94 S.W.3d at 558 (citing *Tracker*, 861 S.W.2d at 433–34). Specifically, we held that a well is capable of production if it is "capable of producing in paying quantities without additional equipment or repairs." *Id.* However, *Thompson* related to the phrase as used in a habendum clause, such that we did not need to determine the date on which this determination is to be made in the shut-in context. *Id.* at 557–58.

We also recognize that the *Tracker* court held, in a lease virtually identical to the one at issue here, that "for a well to be maintained by the payment of shut-in royalties, it must be capable of producing gas in paying quantities *at the time it is shut-in*." *Tracker*, 861 S.W.2d at 432–33 (emphasis added). Like this case, *Tracker* considered whether a lease sustained by a single well in the secondary term had terminated for an unexcused total cessation of production beyond the sixty-day period permitted under the lease's cessation-of-production savings clause. *Id.* at 430–31, 437. The well did not produce gas from May 25, 1989, until December 1989, but the lessee argued that lease was sustained by the shut-in royalty clause. *Id.* at 432. The well had stopped producing on

May 25, but the operator was unable to produce any document showing that the well had been intentionally turned off. *Id.* at 431. On May 30, the Railroad Commission notified the operator that it had violated the well's reduced rate authority by overproducing the well's allowable and instructed the operator to shut in the well. *Id.* Thus, the well had stopped producing for unknown reasons five days before the Railroad Commission sent the shut-in demand and seven days before the operator received this notice on June 2. *Id.* No evidence was admitted to show whether the well was intentionally turned off or whether a purchaser refused to take production. *See id.* In fact, the only date for which there was evidence of an intentional shut-in was by way of a stipulation of the parties that the operator shut in the well on July 2 for a twenty-four hour pressure build-up. *Id.* However, evidence did show that the well had several mechanical problems, including corroded tubing and casing, causing it to cease production when it was unable to flow against the sales line pressure. *Id.* at 434–35.

In analyzing whether the lease was sustained by the lease's shut-in royalty clause, the court first held that a market existed for the gas, such that the lessors had "to produce[] sufficient evidence that the well was not capable of producing in paying quantities" in order to negate the shut-in clause. *Id.* at 433. Noting that "the evidence established that the well stopped on May 25, and did not resume production until December. . . . [and that] the well was not producing in paying quantities on May 25, or May 30, the day the RRC attempted to shut-in the well," the court proceeded to inquire whether the well was "capable of producing in paying quantities." *Id.* Applying the standard that a well "capable of production in paying quantities means a well that will produce in paying quantities if the well is turned 'on,' and it begins flowing, without additional equipment or repair,"

15

the court held that sufficient evidence established "that the well was not capable of producing in paying quantities on May 30, the day the well was allegedly shut-in by the RRC." *Id.* at 433–34, 435. Thus, according to the court of appeals, sufficient evidence supported the trial court's finding "that the well was shut down in May due to mechanical problems, and hence was not capable of producing in paying quantities, and thus could not have been shut-in by the RRC." *Id.* at 435.

We find *Tracker*'s analysis of the proper date on which to determine a well's capability of production in paying quantities for shut-in purposes confusing and inconsistent. First, the court of appeals did not consider the terms of the lease's shut-in clause, which is virtually identical to the one at issue here. *See id.* at 431–35. Further, the well at issue in *Tracker* was not shut in on May 30; the only thing that occurred on May 30 was that the Railroad Commission sent a demand that the operator shut in the well, which the operator received seven days later. *Id.* at 431. However, the well had ceased production on May 25 and did not produce for more than seventy days thereafter due to several mechanical problems, including corroded tubing and casing. *Id.* at 431, 434–35. The only date for which there was evidence of an intentional shut-in was the twenty-four hour pressure build-up on July 2, by stipulation of the parties. *Id.* at 431. Despite these facts, the court held that "for a well to be maintained by the payment of shut-in royalties, it must be capable of producing gas in paying quantities *at the time it is shut-in*," *id.* at 432–33 (emphasis added), and that sufficient evidence established "the well was not capable of producing in paying quantities on May 30, the day the well was allegedly shut-in by the RRC," *id.* at 435. We find no authority to support the proposition that the Texas Railroad Commission can invoke a lessee's shut-in right by sending a notice demanding that the operator shut in a well that stopped producing five days earlier due to

16

mechanical problems. In any event, the *Tracker* court analyzed whether the well in question was "capable of producing" when "shut in" by the Railroad Commission, not whether the well was capable of production in paying quantities on the date the producer tendered its shut-in royalties, which is the rule Red Deer is asking this Court to adopt here. *See id.* at 433, 435.

We also conclude that *Tracker* is distinguishable from the case at bar for a number of reasons. First, the well in *Tracker* stopped producing due to mechanical problems, whereas the Vera Murray #11 experienced a gradual decline in production marked by a general pattern of flowing gas for a period of time every other day and occasionally longer periods with no production, while the well's "plunger lift" system allowed for reservoir pressure to build. *Id.* at 434–35. Second, we find no evidence in the record that the Railroad Commission instructed BP to shut in its well, as was the case in *Tracker*. *Id.* at 431. Third, in this case, we know when the valve was turned off, whereas the only evidence of shut-in in *Tracker* was the parties' stipulation that the operator shut in the well on July 2 for a twenty-four hour pressure build-up and then attempted to turn the well back on the next day. *Id.* Finally, the *Tracker* court made no mention of tender of any shut-in royalty payment whatsoever, whereas Red Deer asks us to hold that the material date for the inquiry into capability of production in paying quantities is the date noted on BP's shut-in royalty checks. Therefore, to the extent that *Tracker* defines the proper date on which to determine a well's capability of production in paying quantities for shut-in purposes, we hold that *Tracker* is distinguishable and does not control the outcome of this case.

We conclude that Red Deer's second theory, as charged to the jury, is not a valid theory of lease termination that can support a judgment terminating BP's lease. The shut-in clause in the Vera

17

Murray lease unambiguously uses the date gas was last sold or used, not the date the shut-in royalty was paid or the date the valve was closed, as the operative date for determining a well's capability to produce gas in paying quantities over a reasonable period of time. Tender of the shut-in royalty at any time "before the end of the twelve-month period during which such gas is not sold or used" preserves the lease from the last day on which gas was sold or used, so long as the shut-in well was capable of production in paying quantities on the day the last gas was sold or used. Because the last gas was sold or used on June 4, Red Deer bore the burden of proving and obtaining a finding that the #11 well was incapable of production in paying quantities over a reasonable period of time as of June 4, 2012. Red Deer failed to do so. Accordingly, Red Deer failed to carry its burden to prove and obtain a finding that BP's exercise of its shut-in right was improper under the terms of the lease.

Red Deer's argument that June 13, 2012, is the proper date on which to measure capability of production in paying quantities is based on BP's shut-in royalty payment, which included the notation, "for the 0 months beginning 06/13/2012." However, as explained above, regardless of the date of tender, the inquiry under the plain language of the shut-in clause is whether the well could produce in paying quantities on the date gas was last sold or used, not the date of tender or the date the valve was closed. Thus, the lease clearly provides that BP could shut in the #11 well so long as tender was made up to twelve months after gas was last sold or used, but the tender only "saves" the lease if it was capable of production in paying quantities on the date gas was last sold or used.

In support of its contention that the period shown on the shut-in royalty check or correspondence with the royalty owner controls the period that the shut-in royalty substitutes for production, Red Deer cites *Mayers v. Sanchez-O'Brien Minerals Corp.*, 670 S.W. 2d 704, 708 (Tex.

18

App.—San Antonio 1984, writ ref'd n.r.e.) (citing RICHARD W. HEMINGWAY, THE LAW OF OIL AND GAS § 6.5, at 313 (2d ed. 1983); *Steeple Oil & Gas Corp. v. Amend*, 337 S.W.2d 809, 811 (Tex. Civ. App.—Amarillo 1960, writ ref'd n.r.e.); *Shell Oil Co. v. Goodroe*, 197 S.W.2d 395, 399 (Tex. Civ. App.—Texarkana 1946, writ ref'd n.r.e.)). However, *Mayers* involved a summary judgment dispute about the proper anniversary date for shut-in royalty payments in a lease stating that the anniversary shut-in date was based on "the date the first payment is made." *Id.* The *Mayers* court explained that "normally the date of capping of the well or the date of the shut-in royalty will determine the anniversary date of further royalty payments." *Id.* The question before the Court in this case, however, is not whether BP made a timely anniversary shut-in royalty payment; rather, the issue is whether Red Deer obtained a finding that the #11 well was incapable of production in paying quantities on the measuring date specified in the Vera Murray lease. Thus, we conclude that *Mayers* is distinguishable because it addresses an issue not presented in this case.

We hold that the submission of Red Deer's second theory through Questions 3 and 4 was improper because Red Deer did not request a finding that BP's well was incapable of production in paying quantities on the last day gas was sold or used—June 4, 2012. Question 3 relates to a savings clause, and Red Deer claims the lease terminated for a failure of production in paying quantities in the secondary term. But a necessary prerequisite to Red Deer's claim that BP's invocation of the shut-in royalty clause was ineffective was a finding that the #11 well was incapable of production in paying quantities the last day gas was sold or used. Red Deer failed to request and obtain that finding. BP's shut-in royalty check tendered the shut-in royalty less than ten days after the last day gas was sold or used, even though it could have tendered the royalty at any time before June 4, 2013,

19

such that constructive production in paying quantities began on June 4, 2012. Thus, Red Deer never obtained a finding that the lease failed to produce in paying quantities before constructive production took effect. The jury's answers to Questions 3 and 4 cannot support a judgment terminating BP's lease.

Red Deer argues that BP waived this issue by failing to object at the charge conference. Generally, to preserve error, a party must specifically object, clearly identify the error, and explain the grounds for the objection. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). Rule 274 of the Texas Rules of Civil Procedure provides: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274; *see also* TEX. R. APP. P. 33.1(a)(1) (explaining that preservation requires a "timely" objection "with sufficient specificity to make the trial court aware of the complaint").

BP did not raise this error during the charge conference by making a clear objection to the submission of June 13 as the proper measuring date. BP objected to the submission of a separate question regarding whether the #11 well was incapable of production after June 13, 2012, and suggested that the trial court submit one question encompassing all relevant periods and ask the jury to fill in blanks regarding dates the lease or well was not producing in paying quantities. BP's counsel recommended in the alternative that the trial court make Questions 3 and 4 conditional on an affirmative answer to Questions 1 and 2. BP also objected to the use of different dates in Questions 1 and 3, asserting that using two different dates would give Red Deer a "confusing second

20

bite at the apple." Finally, BP objected to the submission of Question 3 because no evidence supported its submission and because "the point of the submission is to defeat and indeed write out of the lease the valuable right of a shut-in tender, which constitutes constructive production." BP argued:

> [W]e would point out that doing a second submission of whether or not the well is capable of producing in paying quantities, but limiting it to one day after the last submission is needlessly confusing to the jury and is quite literally a second bite at the apple. This could be easily accomplished by just extending Question 1 one day to include this date and then asking the jury to say the date that it finds that the well is not—or that the range of dates that the jury finds the well was not capable of producing in paying quantities.

Thus, BP objected to submitting separate questions for the *Clifton* theory based on cessation of production in paying quantities and Red Deer's total cessation theory relating to BP's alleged failure to make a valid shut-in tender instead of combining both actions into one question. However, BP never took specific steps to make the trial court aware that the June 13 date was improper.

BP responds by arguing that the jury's answer to Question 1 renders Question 3 immaterial and that parties can always raise immateriality post-verdict because immaterial answers cannot support a judgment. We agree that Question 3 is immaterial, but for a different reason. A party need not object to an immaterial question that should not have been submitted or cannot support a judgment to preserve error. *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 703–04 (Tex. 2007); *see also Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840 (Tex. 2000) (recognizing that questions that do not submit essential predicates render an answer immaterial). "A jury question is considered immaterial when its answer can be found elsewhere in the verdict or

when its answer cannot alter the effect of the verdict." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995).

We conclude that the jury's answer to Question 3 is immaterial, such that BP was not required to object at the charge conference. As we have already explained, the submission of Questions 3 and 4 was improper because Question 3 asked the jury to determine capability of production in paying quantities on a different date from that required by the lease's shut-in clause and after retroactive constructive production under the shut-in clause took effect. BP preserved error on the immateriality issue by raising these concerns post-verdict in a motion for judgment in disregard, in a motion for judgment notwithstanding the verdict, and in a motion for new trial.

## III. Conclusion

We hold that the submission of Questions 3 and 4 was improper and that the jury's affirmative answer to those questions cannot support a judgment against BP because Question 3 did not track the clear language of the lease, which requires that the determination regarding capability of production in paying quantities be made on the date that gas was last sold or used. Because the jury answered "no" to Question 1, Red Deer failed to obtain a favorable finding against BP that can support a judgment. For this reason, we do not reach whether the jury's answer to Question 1 was a failure to find or affirmative finding for BP, whether legally sufficient evidence supports the verdict, or whether the trial court erred by refusing BP's requested instructions. Accordingly, we reverse the judgment of the court of appeals and render a take-nothing judgment in favor of BP.[6]

---

[6] We render in favor of BP rather than remand for a new trial because Red Deer submitted a theory upon which it could not recover. *See, e.g.*, *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (rendering in favor of the defendant where the plaintiff failed to ensure that the jury submission included all elements

22

 

                                                               _____
Paul W. Green
Justice

**OPINION DELIVERED:** April 28, 2017

---

necessary to recovery under the claimed cause of action). *See generally Stutzman*, 46 S.W.3d at 839 (discussing effect of erroneous submissions in a variety of contexts).