In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-25-00012-CV
_____

ZARVONA ENERGY LLC AND ZARVONA III-A, LP, Appellants

V.

BLACK STONE MINERALS COMPANY, L.P. AND SUGARBERRY
MINERALS LP, Appellees

On Appeal from the 88th District Court
Tyler County, Texas
Trial Cause No. 27,147

MEMORANDUM OPINION

Zarvona Energy LLC and Zarvona III-A, LP ("Zarvona") sued Blackstone Minerals Company, L.P. ("Blackstone") and Sugarberry Minerals L.P. ("Sugarberry") seeking breach-of-contract damages and a declaratory judgment that two oil and gas leases held by Zarvona remained in full force and effect because there had been continuous production in paying quantities following the expiration of the primary term of each lease. After Zarvona's motions for partial summary judgment against Blackstone and Sugarberry were denied, the trial court granted

1

Zarvona permission to file an interlocutory appeal, finding there are controlling questions of law as to which there is substantial ground for difference of opinion and the immediate appeal of which will materially advance the ultimate termination of the litigation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(d); Tex. R. Civ. P. 168. We accepted the appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(f); Tex. R. App. P. 28.3. Because we conclude the trial court erred in denying Zarvona's motions, we reverse, render partial summary judgment, and remand for further proceedings in the trial court.

## Background

In April 2005, Sugarberry's predecessor granted Blackstone's affiliate, Blackstone Energy Company, L.L.C., ("BSEC"), an oil and gas lease on 245 acres in Tyler County. In August 2005, Blackstone granted BSEC an oil and gas lease on 7,141.92 acres in Tyler and Polk Counties. Each lease contains identical terms relevant to this appeal. Each defines a "Primary Term" which ends on a date certain, potentially followed by a secondary term the termination of which is the subject of controversy in this case. The Blackstone Lease, for example, contains the following provisions:

> 1.1    Subject to the other provisions of this Lease, this Lease shall be for a term from the above Effective Date until August 29, 2007 (hereinafter called "Primary Term") or any extension thereof provided for herein and for so long thereafter as oil and/or gas continues to be produced in paying quantities from the Leased Premises, or lands

2

pooled therewith as may be provided, herein under the terms of this Lease.

[. . .]

11.0  . . .

(b)    Unless maintained by other provisions hereof, cessation of production in paying quantities after the Primary Term for a period of ninety (90) days shall cause this Lease to terminate.

The same provisions of the Sugarberry Lease are identical except that the Primary Term ended on April 1, 2008.

As contemplated by the terms of the leases, BSEC pooled acreage covered by various leases to form the "Clarke Unit," which includes acreage from both the Blackstone and Sugarberry leases. BSEC pooled other acreage to form the "Simmons," "Delta," and "Woods" units, each of which includes acreage from the Blackstone Lease, but not the Sugarberry Lease. Before the primary term of either lease expired, BSEC drilled a producing well on each of these four units. Each lease contains a continuous development provision, as follows:

10.0  If, at the expiration of the Primary Term, oil or gas is being produced and Lessee is then engaged in drilling or reworking operations on unreleased acreage of such Leased Premises, then this Lease shall remain in force and effect as to such acreage not developed in accordance with Section 3.0, so long as after the date of the expiration of the Primary Term (or the date drilling or reworking operations cease if being conducted), Lessee does not permit more than ninety (90) days to elapse before commencing the next well on said Leased Premises and thereafter shall not allow more than ninety (90) days to elapse between the completion or abandonment of one well and commencement of another.

3

Each lease also contains the following provisions:

3.0 . . . Following the 90-day continuous development provision provided in Section 10.0 hereof, this Lease shall terminate, except as to all wells producing oil or gas in paying quantities or being drilled or reworked, and as to the area of the Leased Premises comprising the spacing units surrounding each well, or portion thereof included within the boundaries of any pooled unit or units as hereinafter provided. This Lease shall not terminate as to easements and rights-of-way necessary for Lessee's operations on the retained acreage provided that production from such acreage shall be continuous and upon cessation of production, this Lease shall terminate as to such acreage unless production therefrom is restored within ninety (90) days from such cessation by drilling or reworking operations thereon, or otherwise maintained in force provided elsewhere in this Lease.

3.1 Subject to the continuous operations provisions of Sections 9.0 and 10.0, at the end of the Primary Term and at all times thereafter, as to each spacing unit, Lessee shall promptly release this Lease as to all depths below one hundred feet (100') below the stratigraphic equivalent of the base of the deepest productive reservoir from which there is commercial production of oil and/or gas from the well located in said spacing unit.[1]

Contending that section 3.0 calls for a one-time termination of non-producing units following the 90-day continuous development provision of section 10.0, Zarvona concedes that the Blackstone Lease terminated except with respect to the lands pooled into the Clarke, Delta, Simmons, and Woods units because no new wells were commenced within ninety days after the primary term expired on August 29, 2007, and that the Sugarberry Lease (which did not include acreage in the Delta,

---

[1]Section 9.0 applies only when oil or gas is not being produced at the expiration of the primary term; no party asserts it applies in this case.

4

Simmons, or Woods units) terminated except with respect to 151.9 acres located in the Clarke Unit because no new wells were commenced within ninety days after the lease's primary term expired on April 1, 2008.

In July 2018, BSEC assigned all right, title and interest in the oil and gas leases associated with the Clarke and Simmons units to Zarvona. Zarvona then began operating the Clarke and Simmons units and, in 2022, drilled two producing wells on the Clarke Unit.

In September 2023, Blackstone sent Zarvona a letter asserting that on June 1, 2020, the Blackstone Lease had terminated with respect to 1,562.7 acres comprising the Clarke Unit "for failure to produce in paying quantities as required by the Lease" and demanding that Zarvona execute and file a release of the lease as to the acreage included within that unit. When Zarvona refused, Blackstone filed a partial release in the county deed records, after which Zarvona sued Blackstone seeking damages and a declaratory judgment construing various terms of the lease.

Blackstone answered and counterclaimed, and Zarvona filed a motion for partial summary judgment seeking declarations that "(a) the retained acreage clause is a snapshot provision and does not provide for rolling lease terminations during the secondary term on a unit-by-unit basis, and (b) Section 11.0(b) does not apply on a unit-by-unit basis and does not define the measuring period for assessing production in paying quantities when production has not ceased[.]" Based on an affidavit and

5

various exhibits including production records from wells in the Clarke, Delta, Simmons, and Woods units, the motion argues there has always been continuous production in paying quantities from those units as measured by the reasonably-prudent-operator standard set forth in *Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1959). Blackstone's response, supported by an affidavit and various exhibits, argues the Blackstone Lease terminated not only with respect to the Clarke Unit (which Blackstone asserts failed to produce in paying quantities over several 90-day periods) but in its entirety since the production records reveal that the Clarke, Delta, Simmons, and Woods units, individually and collectively, lost money in April, May, and June 2020.

Zarvona subsequently amended its petition to add Sugarberry as a defendant based on allegations that Sugarberry had sent Zarvona a letter in January 2024 asserting the Sugarberry Lease had terminated and that Sugarberry filed a release in the county deed records to that effect in March 2024. Zarvona then moved for partial summary judgment against Sugarberry on essentially the same grounds asserted in its motion regarding the Blackstone Lease, and Sugarberry filed a response asserting essentially the same grounds asserted by Blackstone in opposition. The trial court denied Zarvona's motions and then granted permission for Zarvona to file an interlocutory appeal regarding three controlling questions of law for which it found there is a substantial ground for difference of opinion and the immediate appeal of

which will materially advance the ultimate termination of the litigation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(d). Zarvona's brief restates the three issues on appeal as follows:

> 1. Whether Section 11.0(b) of the Lease is triggered after production in paying quantities ceases under the paying-quantities test established in *Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1959) or whether Section 11.0(b) replaces *Clifton* and defines a 90-day measuring period for a paying-quantities analysis without regard to the reasonably prudent operator standard.

> 2. Whether Section 11.0(b) of the [Blackstone] Lease applies to all of the retained acreage under the [Blackstone] Lease collectively or whether it applies on a pooled-unit basis.

> 3. Whether the retained acreage clause in the [Blackstone] Lease is a snapshot clause that operates only once at the end of the continuous development period or whether the clause provides for a rolling, partial lease terminations on a pooled-unit basis.[2]

Analysis

Zarvona's motions for partial summary judgment and Blackstone's and Sugarberry's responses presented the trial court with conflicting interpretations of the leases' provisions. Blackstone and Sugarberry argue the operative language means a cessation of production in paying quantities during any given 90-day timeframe results in termination of the leases. Zarvona interprets the same contractual provisions to require the evaluation of a variety of factors and data

---

[2]The order regarding the Sugarberry Lease (which does not include the Delta, Simmons, or Woods units) does not include the second and third issue.

gathered over a reasonable period of time that a reasonably prudent operator would consider in deciding whether to continue to operate the wells, eschewing the mechanical subtraction of 90-day operating expenses from 90-day revenues. Zarvona's briefing, both in the trial court and in this Court, allows for the possibility that the operative language is ambiguous and must be construed in Zarvona's favor, whereas Blackstone and Sugarberry flatly reject any ambiguity.

The fact that parties disagree about the meaning of a contract does not render the contract ambiguous; rather, a contract is ambiguous only when it is susceptible to more than one reasonable interpretation. *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). Whether a mineral lease is ambiguous is a question of law for the court, as is the construction of an unambiguous lease, both of which questions we review de novo. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

The framework for conducting our analysis begins by acknowledging that mineral leases are contracts and, as such, they are governed by the same general principles which govern our construction of contracts, generally. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). These general principles require us "to determine, objectively, what an ordinary person

8

using those words under the circumstances in which they are used would understand them to mean." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018). They also require us to "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Thompson*, 94 S.W.3d at 554. "The most important consideration in interpreting a lease is the agreement's plain, grammatical language." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). In addition to these general principles, special rules apply to the construction of mineral leases:

> Because oil and gas leases "transfer and affect title to real-property interests, however, they are subject to special construction rules that apply particularly to agreements governing property rights." One such rule is that contractual language will not be held to automatically terminate the leasehold estate unless that "language . . . can be given no other reasonable construction than one which works such result." We recently reaffirmed this principle: "Although whether a lease has terminated is always a question of resolving the intention of the parties from the entire instrument, we will not find a special limitation 'unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning.'"

*Id.* at 148-49 (citations omitted).

With the analytical framework established, we turn to the lease's operative language.[3] The provisions which most conspicuously address the question of

---

[3]Aside from dates and identification of parties and "Leased Premises," the relevant language of each lease is identical; therefore, we will analyze the Blackstone Lease with the understanding the same analysis applies to the Sugarberry Lease unless otherwise noted.

whether the lease may have terminated are sections 1.1 (the "habendum clause"), and 11.0(b) (the "cessation-of-production clause"), which provide as follows:

> 1.1    Subject to the other provisions of this Lease, this Lease shall be for a term from the above Effective Date until August 29, 2007 (hereinafter called "Primary Term") or any extension thereof provided for herein and for so long thereafter as oil and/or gas continues to be produced in paying quantities from the Leased Premises, or lands pooled therewith as may be provided, herein under the terms of this Lease.[4]

> [. . .]

> 11.0  [. . .]

> (b)    Unless maintained by other provisions hereof, cessation of production in paying quantities after the Primary Term for a period of ninety (90) days shall cause this Lease to terminate.

As is typical, the lease's habendum clause defines the duration of the lease by dividing it into a primary term that ends on a date certain followed by a secondary term that continues as long as oil or gas is being "produced in paying quantities from the Leased Premises or lands pooled therewith[.]" *See Discovery Operating, Inc.*, 554 S.W.3d at 597 (discussing a habendum clause). The phrase "produced in paying quantities" has received some attention from Texas courts. Although the lease in *Clifton* did not include the phrase, the Texas Supreme Court held "the terms

---

[4]The Blackstone Lease defines "Leased Premises" as the original 7,141.92 acres which were then pooled into the Clarke, Delta, Simmons, and Woods Units. The Sugarberry Lease defines "Leased Premises" as the original 245 acres, 151.9 acres of which was pooled into the Clarke Unit, the other 93.1 acres having been released by Zarvona at the end of the continuous development period.

'produced' and 'produced in paying quantities' mean substantially the same thing" and then went on to explain how the phrase "produced in paying quantities" should be construed with respect to wells which operate some months at a profit and other months at a loss:

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.
>
> In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matter which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his product, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes.
>
> The term 'paying quantities' involves not only the amount of production, but also the ability to market the product (gas) at a profit. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test.

*Clifton*, 325 S.W.2d at 690-91 (citations omitted).

Were the habendum clause the only provision addressing termination of the lease, the trial court would be required to apply the reasonably-prudent-operator standard set out in *Clifton* to determine whether and when the lease terminated. But the habendum clause begins with the introductory phrase, "Subject to the other provisions of this Lease […]" and there are, in fact, other provisions which address

11

termination. Section 11.0(b) is such a provision. It states that after the primary term has expired, the lease will terminate upon a 90-day cessation of production in paying quantities.

The Waco Court of Appeals has held that "if the lease defines the period for which production-in-paying-quantities is to be measured, the court does not resort to a 'reasonable period of time' over which to evaluate the profitability of production." *Ridenour v. Herrington*, 47 S.W.3d 117, 121-22 (Tex. App.—Waco 2001, pet. denied). Relying on this holding, Blackstone and Sugarberry argue, "The *Clifton* decision cannot supplant the plain language of Section 11.0(b) because that section makes clear that the time period for whether either Lease was producing in 'paying quantities' is (90) ninety days." Blackstone and Sugarberry then point to the "uncontroverted affidavit of an expert witness who utilized Zarvona's own data to prove that the Leases were unprofitable for multiple 90-day periods—evidence that Zarvona neither controverted nor questions on appeal." Indeed, one of the summary judgment exhibits shows all four units, individually and collectively, operated at a loss for three consecutive months from April 2020 to June 2020, a period of 91 days.

But the cessation-of-production clause in our case differs from that in *Ridenour*, and it does so in a way we consider significant. There, the provision stated, "Cessation of paying production after the primary term for a period of sixty days shall cause this lease to terminate." *Id*. at 119. Here, although section 11.0(b)

12

contains almost identical language, it begins with the introductory phrase, "Unless maintained by other provisions hereof, . . . [.]" Section 1.0 is such a provision because according to *Clifton*, section 1.0 maintains the lease so long as a reasonably prudent operator, considering a variety of factors and data gathered over a reasonable period of time, would continue to operate wells on the Leased Premises or lands pooled therewith.

Sections 1.0 and 11.0(b) are in conflict because they provide different tests for determining when the lease terminates. Sections 1.0 and 11.0(b) do not directly reference each other, but each section contains introductory language appearing to make each subordinate to the other. A similar problem was addressed in *Cromwell v. Anadarko E&P Onshore, LLC*:

> Anadarko argues that Paragraph 16 requires Cromwell himself to cause production. While Paragraph 16 purports to impose some obligations on the lessee, Paragraph 16 is by its own terms "[s]ubject to Paragraphs 6 and 11"—both of which contain still more passive-voice language and fail to specify who must undertake the various actions. Further obscuring things, while Paragraph 16 is "[s]ubject to Paragraph[ ] . . . 11," Paragraph 11 is likewise "[s]ubject to Paragraph . . . 16." Because Paragraph 16 is ambiguous, the default rule against forfeiture controls. *See Energen*, 615 S.W.3d at 149 (holding that if ambiguity remains after an attempt to interpret a lease based on its plain language, courts may rely on default rules of construction).

716 S.W.3d 515, 523 (Tex. 2025). While we acknowledge the leases at issue in *Cromwell* contained ambiguities other than the mutual subordination of conflicting provisions, we nevertheless conclude that the overarching principle applied in

13

*Cromwell* applies equally in this case, that principle being that "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Id*. at 523-24 (citing *Thompson*, 94 S.W.3d at 554). "A special limitation in an oil-and-gas lease is a term that 'provides that the lease will automatically terminate upon the happening of a stipulated event.'" *Id*. at 524 (quoting *Discovery Operating Inc.*, 554 S.W.3d at 606).

Because sections 1.0 and 11.0(b) contain language subjecting each section to the other, we cannot harmonize their dissonant provisions regarding the duration or termination of the lease. Together, these provisions are ambiguous as a matter of law. "We disfavor forfeiture of mineral interests." *Id.* at 523. "[W]hen all available means of interpreting the lease are exhausted and the disputed provision remains equally susceptible to multiple reasonable readings, the ambiguity will be resolved against imposition of a special limitation." *Energen Res. Corp.*, 615 S.W.3d at 149. Because section 11.0(b) purports to impose a special limitation but does not "clear[ly], precise[ly], and unequivocal[ly]" state that the lease terminates upon a 90-day cessation of production in paying quantities, we will not regard such a cessation to result in forfeiture of the lease unless there is a cessation that also fails *Clifton's* reasonably-prudent-operator test which is ingrafted into section 1.0. *See*

14

325 S.W.2d at 691; *see also Cromwell*, 716 S.W.3d at 524 (declining "to resolve the ambiguity in a way that forfeits [Cromwell's] interest.").

Having answered Zarvona's first issue by holding that the *Clifton* standard applies, we turn to Zarvona's second issue which asks, "Whether Section 11.0(b) of the Blackstone Lease applies to all of the retained acreage under the Blackstone Lease collectively or whether it applies on a pooled-unit basis."

Because section 11.0(b) and section 1.0, both contain provisions regarding the duration of "this Lease" and section 1.0 specifically references production in paying quantities "from the Leased Premises, or any lands pooled therewith[,]" these provisions may be read in harmony with respect to the geographic aspects of the paying-quantities test. "As long as one portion of the leased tract—even a small portion—is producing oil or gas, the lease will continue as to the entire tract, even if the operator elects not to develop other areas within the leased tract." *Discovery Operating Inc.*, 554 S.W.3d at 597. A cessation of paying production can occur in two ways: (i) a total, physical cessation of production (which no one argues occurred here); or (ii) a cessation of production in paying quantities. *See BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 395–96 (Tex. 2017) (explaining the two theories of lease termination based on cessation of production). Accordingly, section 11.0(b), read in harmony with section 1.1, indicates that when there is either a complete cessation of production on the entire Leased Premises and lands pooled

15

therewith, or a cessation of production in paying quantities, as determined under *Clifton,* on the entire Leased Premises and lands pooled therewith, the entire Blackstone Lease will terminate ninety days after such cessation began unless production in paying quantities is restored on some portion of the Leased Premises or lands pooled therewith during that ninety-day period. Nothing in either section calls for the termination of a portion of the lease based on a ninety-day cessation in production (either completely or in paying quantities) from that portion of the lease. Therefore, we answer the second question by holding that to the extent that section 11.0(b) of the Blackstone Lease applies at all, it applies to all the retained acreage under the Blackstone Lease, collectively, and not on a pooled-unit basis.

However, sections 1.0 and 11.0(b) are both subject to other provisions in the lease, including sections 3.0 and 3.1, which provide in relevant part:

> 3.0   . . . Following the 90-day continuous development provision provided in Section 10.0 hereof, this Lease shall terminate, except as to all wells producing oil or gas in paying quantities or being drilled or reworked, and as to the area of the Leased Premises comprising the spacing units surrounding each well, or portion thereof included within the boundaries of any pooled unit or units as hereinafter provided. This Lease shall not terminate as to easements and rights-of-way necessary for Lessee's operations on the retained acreage provided that production from such acreage shall be continuous and upon cessation of production, this Lease shall terminate as to such acreage unless production therefrom is restored within ninety (90) days from such cessation by drilling or reworking operations thereon, or otherwise maintained in force provided elsewhere in this Lease.

16

3.1 Subject to the continuous operations provisions of Sections 9.0 and 10.0, at the end of the Primary Term and at all times thereafter, as to each spacing unit, Lessee shall promptly release this Lease as to all depths below one hundred feet (100') below the stratigraphic equivalent of the base of the deepest productive reservoir from which there is commercial production of oil and/or gas from the well located in said spacing unit.

Neither party suggests section 9.0 (referenced in section 3.1) applies in this case, but both parties seem to agree section 10.0 (referenced in both sections 3.0 and 3.1) is relevant, and it provides:

10.0 If, at the expiration of the Primary Term, oil or gas is being produced and Lessee is then engaged in drilling or reworking operations on unreleased acreage of such Leased Premises, then this Lease shall remain in force and effect as to such acreage not developed in accordance with Section 3.0, so long as after the date of the expiration of the Primary Term (or the date drilling or reworking operations cease if being conducted), Lessee does not permit more than ninety (90) days to elapse before commencing the next well on said Leased Premises and thereafter shall not allow more than ninety (90) days to elapse between the completion or abandonment of one well and commencement of another.

This brings us to Zarvona's third issue which asks, "Whether the retained acreage clause [section 3.0] in the [Blackstone Lease] is a snapshot clause that operates only once at the end of the continuous development period or whether the clause provides for a rolling, partial lease terminations on a pooled-unit basis." Zarvona concedes that since no well was commenced within 90 days after the expiration of the primary term, the application of sections 10.0 and 3.0 resulted in a one-time termination of the Blackstone Lease as to any acreage outside the Clarke,

17

Delta, Simmons, and Woods units where wells were producing as of that date. However, Zarvona contends section 3.0 does not call for additional terminations of geographic units on a continual basis.

Blackstone asserts section 3.1 which applies "at the end of the Primary Term *and at all times thereafter*" (emphasis added) should inform our analysis of whether section 3.0 applies once as a "snapshot" provision or on a continual or "rolling" basis, arguing, "It would make no sense at all to have inconsistent and contradictory provisions for the release of acreage, where the one (units in general) is a snapshot provision and the other (depths within a unit) is rolling." We disagree. It may be that the parties intended in section 3.0 to provide for a one-time termination of all depths below non-producing units "following" section 10.0's 90-day period and that they also intended in section 3.1 to provide for recurring releases of certain depths below the deepest producing reservoir of the producing units "at all times" after the end of the primary term. We cannot conclude they intended otherwise when they used different terms to express the temporal applicability of each section.

"To determine a term's common, ordinary meaning, we typically look first to dictionary definitions and then consider the term's usage in other authorities." *Anadarko Petroleum Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019). As used in section 3.0, "Following" means "subsequent to[.]" Following, Merriam-Webster.com https://www.merriam-webster.com/dictionary/following (last visited

18

Feb. 19, 2026). The word indicates *when* section 3.0 applies—after the end of the 90-day period provided by section 10.0—but it does not indicate *how often* it applies. As a result, section 3.0 is ambiguous because it could be reasonably understood either as a "snapshot" or as a "rolling" provision. Section 3.0 is a special limitation provision because it provides that the lease will automatically terminate as to certain geographical areas upon the happening of a stipulated event. *See Discovery Operating Inc.*, 554 S.W.3d at 606. We conclude that while section 3.0 clearly, precisely and unequivocally indicates that it applies to non-producing geographical units after the end of the 90-day period provided by section 10.0, it does not clearly, precisely and unequivocally indicate that it applies on a recurring basis, and we will not construe the provision to result in forfeiture of additional non-producing geographical units on a recurring basis. *See Cromwell*, 716 S.W.3d at 524 (declining "to resolve the ambiguity in a way that forfeits [Cromwell's] interest[]"). Therefore, we answer the third question by holding that the retained acreage clause in the Blackstone Lease is a snapshot clause that operates only once at the end of the continuous development period.

Because we conclude that the trial court erred in failing to grant Zarvona's motion for partial summary judgment, we reverse and render judgment declaring, "the retained acreage clause is a snapshot provision and does not provide for rolling lease terminations during the secondary term on a unit-by-unit basis, and (b) Section

19

11.0(b) does not apply on a unit-by-unit basis and does not define the measuring period for assessing production in paying quantities when production has not ceased." Because issues not subject to this permissive interlocutory appeal remain, we remand this case to the trial court for further proceedings consistent with this opinion.

REVERSED AND RENDERED; CASE REMANDED.


KENT CHAMBERS
Justice


Submitted on October 23, 2025
Opinion Delivered March 12, 2026

Before Golemon, C.J., Johnson and Chambers, JJ.