**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00127-CV**

_____

**SILURIA (assignment for the benefit of creditors), LLC, Appellant**

**V.**

**LUMMUS TECHNOLOGY LLC, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-03-03166-CV**

**MEMORANDUM OPINION**

The underlying litigation arises from a dispute over which party is entitled to a $1.5 million "holdback contingency" deposited in an escrow fund when Lummus Technology LLC ("Lummus") purchased Siluria (assignment for the benefit of creditors), LLC's ("Siluria ABC") assets. Following a jury trial where the jury answered the sole question in favor of Lummus, the trial court's judgment awarded Lummus: $1,495,493.10 to be paid from the court's registry representing the holdback contingency, past attorney's fees of $467,144.50, conditional appellate

1

attorney's fees, and post-judgment interest. In five issues, Siluria ABC appeals the trial court's judgment for Lummus. As discussed more fully below, we affirm the trial court's judgment.

## I. BACKGROUND

The assets purchased by Lummus from Siluria ABC included a "demonstration unit" set up under a lease agreement on Braskem America, Inc.'s ("Braskem") premises in La Porte, Texas.[1] This demonstration unit employed a new oxidative coupling technology ("OCM") that allegedly could be used in manufacturing plastics. Critical to this appeal's resolution is what the "demonstration unit" encompasses, and whether the parties' Escrow Agreement was ambiguous, which was executed at the same time as the parties' Asset Purchase Agreement ("APA"). Neither the APA nor the Escrow Agreement defined the phrases "begun removing" or "demonstration unit." Both agreements provided for a "holdback contingency" related to the demonstration unit.

The parties' agreed terms included Lummus paying $8.5 million for all Siluria ABC's assets, with $7 million paid at closing and $1.5 million in a "holdback contingency" that Lummus paid into an escrow account. Under the Escrow Agreement, the $1.5 million would be paid to Siluria ABC upon the earlier of: (1) Lummus and Braskem entering a lease agreement and site services agreement in

---

[1]Braskem is not a party to the litigation.

accordance with Section 2.1 of the APA to be able to operate the demonstration unit at Braskem's facility; or (2) the sixth (6th) month anniversary of the Closing (as defined in the APA), if by that time Lummus had not begun removing the demonstration unit from Braskem's facility. If neither of those events occurred, Lummus would receive the $1.5 million escrow fund. In other words, if Lummus failed to enter the described lease with Braskem or if it began removing the demonstration unit by the six (6th) month anniversary of Closing, the $1.5 million would be returned to Lummus that it had paid into escrow. It is undisputed that Lummus failed to enter a lease with Braskem to operate the demonstration unit on its premises.

## A. Parties' Relationship, Negotiations and Agreements

In May 2019, Siluria ABC sent Lummus a form APA, and the parties exchanged red-lined versions of these agreements negotiating the terms. Per the Escrow Agreement and APA, the total purchase price for the assets covered was $8.5 million with $7 million of that paid to Siluria ABC at closing and the remaining $1.5 million designated as a "Holdback Contingency" ("the Holdback") paid by Lummus into an escrow account at closing. Which party received the $1.5 million Holdback from the escrow fund was conditioned on certain events as laid out in the parties' agreements. The parties executed both agreements on July 15, 2019.

The APA provided:

## 2. PURCHASE PRICE; PAYMENTS.

**2.1 Purchase Price.** In consideration of the sale, transfer, conveyance and assignment of all of the Purchased Assets to Buyer at the Closing, Buyer shall, as of the Closing, assume only those liabilities, if any, expressly set forth as Assumed Liabilities in Section 3.1 of this Agreement and shall pay to Seller, in the manner stated below, the sum of Eight Million, Five Hundred Thousand U.S. Dollars (US $8,500,000) in cash (the *"Purchase Price"*), as follows:

    a.    Seven Million U.S. Dollars ($7,000,000 Million U.S. Dollars) by wire trans[]fer at Closing; and

    b.    One Million, Five Hundred Thousand U.S. Dollars (US $1,500,000) (the *"Holdback"*) shall be paid by Buyer at Closing to an escrow/trust account, such amounts to be released to Seller upon satisfaction of the Holdback Contingency.

For the purposes of this Agreement, the *"Holdback Contingency"* shall mean that Buyer is able to conclude a lease and site services agreement with Braskem America Inc. (*"Braskem"*) to be able to operate the demonstration unit included in the Purchased Assets at Braskem's LaPorte facility on material terms which are substantially the same as those granted to Assignor in its lease and site services with Braskem dated December 5, 2013 and also including that Braskem would provide in the Buyer's lease a full immunity and hold harmless to Buyer and its affiliates for any environmental issues existing prior to Buyer entering into the lease with Braskem for the leased property, including any caused by Assignor. As a requirement for Buyer to enter into the lease with Braskem, a Phase II Environmental Assessment must be conducted on the leased property with such results to be reasonably satisfactory to Buyer.

The Holdback shall be paid to Seller in its entirety upon the earlier to occur of the following events:

    a.    The date on which Buyer and Braskem have entered into a lease agreement on the terms stated above to be able to operate the demonstration unit at Braskem's Laporte facility; or

b. The sixth (6th) month anniversary of the Closing if, by such date, Buyer has not begun removing the demonstration unit from Braskem's facility.

If neither event occur[s], the entire amount of the Holdback shall be returned to Buyer.

Likewise, Section 3 of the Escrow Agreement provided:

3. <u>Escrow Agent's Duties and Authority to Act</u>. The Escrow Agent is hereby authorized and directed to deliver the Escrow Fund in the amount of $1,500,000.00 by wire transfer of immediately available funds to an account designated in writing by Seller or Buyer, as applicable, to:

a) Seller, upon the earlier to occur of the following events:

ii. The date on which Buyer and Braskem America Inc. ("Braskem") have entered into a lease agreement and the site services agreement in accordance with the requirements set forth in Section 2.1 of the Purchase Agreement to be able to operate the demonstration unit at Braskem's LaPorte facility; or

ii. The sixth (6th) month anniversary of the Closing (as defined in the Purchase Agreement) if, by such date, Buyer has not begun removing the demonstration unit from Braskem's facility.

b) Buyer, if neither event set forth in a) i. or ii. above occurs.

The sixth-month anniversary of closing fell on January 15, 2020.

## B. Lawsuit and Procedural Posture

After the parties closed, Lummus was unable to secure a lease with Braskem as described in the APA to operate the demonstration unit on its premises, and by December 2019, Braskem would no longer allow Lummus on-site. However, after the parties closed and while simultaneously attempting to negotiate a lease with Braskem, Lummus entered Braskem's facility on two occasions to remove some of

the purchased assets. On October 2, 2019, "Lummus removed documents, computers, maintenance tools and spare parts[.]" On November 5, 2019, Lummus removed "remaining documents, instruments, spare parts, safety equipment, maintenance tools, test equipment, golf cart, catalyst samples, and computer hardware."

On January 9, 2020, Lummus sent a letter to the Escrow Agent and Siluria ABC demanding return of the Holdback, stating that given Braskem's unwillingness to enter a lease agreement, "Lummus was forced to begin the removal process for assets related to the demonstration unit from Braskem's Laporte facility in preparation of a lease agreement not being reached." On January 17, 2020, Siluria ABC responded and disputed Lummus's entitlement to the Holdback. Specifically, Siluria ABC claimed that Lummus "did not by January 15, 2020, begin removing the demonstration unit" and that "[a]ny actions that [Lummus] may have taken as described in the January 9, 2020 letter to [begin the removal process for assets related to the 'demonstration unit' were insufficient to meet the actual requirement under Section 2.1 of the [APA]." Therefore, Siluria ABC claimed that the "Holdback Contingency" in Section 3(a)(ii) of the Escrow Agreement was satisfied, and it was entitled to the $1.5 million.

Having received competing demands for the escrow fund, on March 9, 2021, the Escrow Agent filed its Original Petition for Interpleader seeking to deposit the

6

funds into the court's registry. Lummus subsequently answered the interpleader action and cross-claimed against Siluria ABC for breach of contract, declaratory judgment, and attorney's fees. Specifically, Lummus claimed that Siluria ABC breached the Escrow Agreement and as relevant here, sought declarations that it "began removing the demonstration unit from Braskem's facility before January 15, 2020, as set out in Section 3(a)(ii) of the Escrow Agreement[,]" and that it is "entitled to the full amount of the Escrow Fund because neither event in Section 3(a)(i) or (ii) of the Escrow Agreement occurred." Siluria ABC likewise answered the interpleader and cross-claimed against Lummus for breach of contract, declaratory judgment, and attorney's fees. Siluria ABC claimed that Lummus breached the Escrow Agreement and sought declarations that (1) "Lummus had not begun removing the demonstration unit from Braskem's facility" by the deadline as stated in the Escrow Agreement, and (2) "Siluria ABC is entitled to the full amount of the Escrow Fund because at least the event in Section 3(a)(ii) of the Escrow Agreement occurred." In May 2021, the parties filed an Agreed Motion to Interplead the Funds into the Registry of the Court, Award Attorneys' Fees, and to Dismiss Stibbs & Co., PC (the "Escrow Agent"), which the trial court granted.

In April 2022, the parties filed competing motions for summary judgment regarding the Escrow Agreement's construction. In essence, Lummus asserted that the "demonstration unit" encompassed "all the instruments, parts, and equipment

7

necessary to operate the unit[.]" In contrast, Siluria ABC contended the phrase "demonstration unit" in the parties' Escrow Agreement refers "only to the four-story industrial [s]tructure at Braskem's Facility."

Lummus also argued that "begin" in the parties' agreement is undefined and should be given its plain, ordinary meaning, and that Siluria ABC took an unreasonably narrow definition of "demonstration unit" in that it wanted to limit the definition to only the four-story structure. Siluria ABC contended Lummus's definition of "demonstration unit" was overly broad.

In May 2022, the trial court granted Siluria ABC's Motion for Summary Judgment. In July 2022, Lummus filed its Motion for Reconsideration, Motion to Vacate Portion of Summary Judgment Order, and Request for Oral Hearing on Same. Lummus asserted that there were genuine issues of material fact about the meaning of "demonstration unit." Lummus contended that despite Siluria ABC's contention the agreement was unambiguous, Siluria ABC relied on "the external testimony of Siluria ABC's and Lummus' corporate representatives, and other external contracts, in seeking to establish its definition of 'demonstration unit.'" Lummus noted the parties' contradictory summary-judgment evidence, Siluria ABC's limiting the definition to the "four-story structure[,]" and Lummus's definition that included all assets needed for the unit to operate. In August 2022, the trial court granted Lummus's Motion for Reconsideration and vacated its prior

8

summary judgment order in part. The trial court determined that the issues would be tried to a jury. In January 2023, the trial court signed an "Order Clarifying 'Order Granting Lummus Technology LLC's Motion for Reconsideration and Motion to Vacate Portion of Summary Judgment Order.'" In the Order Clarifying, the trial court explained that "no pleaded claims or affirmative defenses have been disposed of in this case and all pleaded claims and affirmative defenses are live issues for trial." In vacating its prior summary-judgment order, the trial court reasoned that "demonstration unit" was an undefined term in the agreement, "making an ambiguity argument possible on appeal."

Before trial, Lummus filed an Unopposed Motion to Designate it as Plaintiff for Trial, which the trial court granted. The parties also agreed to try the issue of attorney's fees to the bench by submitting affidavits, after the jury's verdict.

## C. Trial Evidence of Negotiations and the Parties' Intentions

Three witnesses testified at trial: Will Groten for Lummus; Ian Rubin from Braskem via deposition; and William Trento for Siluria ABC. The documentary evidence included the APA with its exhibits, Escrow Agreement, red-lined versions of the APA, photographs, demand letters, and various emails from the parties and Braskem.

**Will Groten's Testimony**

Will Groten ("Groten") is Lummus's Chief Innovation Officer and negotiated the purchase of assets from Siluria ABC. He described Lummus as a company that helps develop technologies it could license to markets around the world, which they do by acquiring partially developed intellectual property ideas. In 2018, Siluria Technology, LLC ("Siluria Tech") approached Lummus, because it needed additional equity investors. At that time, Groten viewed the assets when he toured the La Porte facility. Although Lummus decided not to invest in Siluria Tech, Lummus thought they could eventually acquire the assets and intellectual property "in a bankruptcy scenario."

Groten explained that in 2019, instead of Lummus completing the deal directly with Siluria Tech, Siluria Tech chose to enter the "ABC process."[2] Groten testified that it made "sense for us to pursue acquiring the technology and its assets . . . so we engaged with Siluria ABC to conclude an Asset Purchase Agreement." Groten viewed Siluria ABC's sale of assets "as a fast-track liquidation sale[,]" and explained that "Siluria wanted as much money as they could get, but speed was of the essence as well." Before purchase, Lummus accessed Siluria ABC's "data room," which included information like a fixed asset sheet, patents, capital projects,

---

[2]The record shows that "ABC" referred to the "assignment for the benefit of creditors" process, which was described as a similar alternative to bankruptcy available to California entities.

the Braskem lease agreement, the site services agreement, and the license agreement for Braskem to use the OCM technology. Groten understood Lummus was buying (1) the intellectual property represented in all the patents, (2) the physical assets that included the lab equipment in California and all the catalysts, and (3) the demonstration unit at La Porte, Texas.

Groten explained that when you do research and development in the chemical engineering space, the purpose of a demonstration unit is the last step in developing a new technology and is "a complex set of assets . . . that have to be operated in a chemical plant environment to prove that the technology does what . . .it says it's supposed to do, but it's also that it can be operated in a chemical plant environment." Groten testified that Lummus understood that the demonstration unit at La Porte was integrated into Braskem's chemical plant operations, as reflected in the site lease and site services agreements between Braskem and Siluria Tech. Those documents were referenced in the APA, and Groten testified the Braskem-Siluria Tech lease showed it allowed Siluria Tech to bring assets and equipment to Braskem's facility for the purpose of demonstrating the OCM technology in "a real operating environment of the Braskem chemical plant."

Groten testified about the APA process with Siluria ABC, and the requirements that the full $1.5 million would be given to the Seller if Lummus entered a lease with Braskem on the same material terms as the Siluria Tech lease

11

plus Lummus would not assume any environmental liabilities. Groten also discussed the APA's holdback contingency and why it was included. He explained that the events they negotiated determined whether the escrow fund would be returned to Lummus or belonged to Siluria ABC. He said they "captured the essence of both parties' needs:" Lummus wanting a demonstration unit capable of operating at the Braskem site and Siluria ABC's need to bring the valuation determination to a conclusion in a six-month period. Groten testified the instructions in the Escrow Agreement match the holdback contingency in the APA, and if neither event occurred, then the money is returned to the Buyer. Groten testified that the $1.5 million holdback was the value assigned for a demonstration unit capable of operating rather than the cost to remove the unit. Groten testified that besides the fixed asset value, the holdback contingency "valued the demonstration unit capable of operating at Braskem at $1.5 million."

The first event related to the contingency was whether Lummus could enter a lease with Braskem under the same terms Siluria Tech had and to be able to operate the demo unit at Braskem's La Porte facility. Groten began negotiating a lease and site services agreement with Ian Rubin from Braskem, but he learned in September 2019, it was unlikely that Lummus would get a lease on the same material terms as the Siluria Tech lease. Even so, Lummus and Braskem were interested in continuing negotiations. The parties did not dispute that Lummus was unable to enter such a

12

lease with Braskem, because, according to Groten, "Braskem made a business decision that they did not want to continue to host the unit there."

Groten testified the parties negotiated the second event in the holdback contingency "because of the Siluria ABC desire for a timely resolution of the value that Lummus would get from the demonstration unit[,]" which was written as "whether or not we have begun removing the demonstration unit from Braskem's facility." Groten testified the parties negotiated the "begun removing" language because, although Siluria ABC initially wanted Lummus to complete removal within six months, Groten knew "that threshold was impossible to achieve." Therefore, Groten said, "I negotiated a very, very low threshold of beginning to remove, as I thought that was something that we could practically achieve in a six-month window." Groten also outlined the complexity of removing the demonstration unit from an operating chemical plant that would make it impossible to complete in six months, including environmental and safety issues. He described the removal process, beginning with the decision to begin removal followed by sending staff familiar with demonstration units in

> to remove those items that you can easily remove and secure to make the unit inoperable. So you would remove computers and you would remove all documentation. You would remove the spare parts. You would remove the catalysts and anything else that was easily removed within the capabilities of our people and bring them to our site.

Groten noted they would simultaneously make sure they understood Braskem's requirements for having third-party contractors on site, then have several contractors to review what it would take to completely remove all the assets, including disassembly of the four-story structure.

Groten testified that once Braskem verbally indicated Lummus would not get the same terms, Lummus began running "parallel path type activities . . . to begin the process of preparing to move the demonstration unit." This included Groten's staff removing certain assets in early October. He explained Lummus's intent in removing the assets: first, they took things that they could remove easily; second, they wanted to secure them, because they contained confidential technical information; and third, they were aware of the criteria they had to begin removing before the six-month date. Groten testified that on October 1, 2019, Lummus reached out to Braskem, because they "were looking to begin removal of critical items . . . that are integral to the demonstration unit, and that included these computers and small critical items at . . . the La Porte facility." When Lummus entered the APA and Groten negotiated the term to begin removing, he had this whole process in mind. The APA required Lummus to begin removing by the six-month anniversary of closing, which they did when his staff went to Braskem on two occasions and removed assets they acquired from the site, rendering the unit incapable of operating safely, and brought them to Lummus's facility. Along with removing those items,

before the January 15, 2020, deadline, Lummus contacted three third-party contractors with the skill set to complete the removal and began asking Braskem for permission to bring them on-site so they could get a quote on complete removal.

Groten explained that he chose three people to retrieve items from Braskem, specifically "because they have a very clear understanding of what a demonstration unit is and the complexities and . . . how demonstration units operate[]" and "were very knowledgeable about the types of equipment that would be there, the safety protocols to go into a plant like that, to assess what can be safely and easily removed[.]" Groten described how the demonstration unit worked and specifically that the unit was "integrated into the larger chemical plant[,]" meaning "it shared a control room, and the control room is connected via wires to all of the instruments and the pumps, the valves, everything that controls the temperatures, the pressures, the flow rates of the chemical processes, including all emergency equipment[.]" He testified the unit had emergency shutdown logic integrated into the software that controls the unit for safety purposes. Groten explained that you needed the control room to run the OCM process, which was "connected via electrical and signaling wires to various components." He testified the control room contained "sophisticated computers" typically referred to as "DCS, digital control systems" which monitor everything going on in the various pieces of equipment, like pressures, temperatures,

15

and flow rates; it also controls the valves, pumps, and motors and contains "emergency shutdown logic."

Groten said that chemical analyzers in the control room and in the structure which were "important to understand what was happening inside the pipes in the catalyst" and "it's essential . . . to have a unit capable of operating." Among other things, Groten discussed photographs of items in the control room, including computers, and catalysts adjacent to the "four-story structure." He testified that the computer taken from the control room analyzed data coming from DCS system signals, and the unit could not operate safely without the computer. Groten also testified that the catalysts were required for the OCM process.

Groten explained that in the APA, the language was meant to be "comprehensive" given the demonstration of technology and was written "to be almost a catchall because what you don't want is something to disappear or to be argued about that it wasn't included in the . . . Asset Purchase Agreement." Groten testified that Bill Trento from Sherwood Partners was involved in the APA negotiations. Groten led the APA negotiations for Lummus with assistance from inside counsel. Per the APA, the total purchase price for the assets covered was $8.5 million with $7 million of that "upfront." Groten testified that the $7 million covered all the assets including the intellectual property "but it did not include . . . a demonstration unit capable of operating at the Braskem La Porte facility." Groten

said the value of that asset was contingent upon the terms under which Lummus could continue to operate that demonstration unit at the Braskem La Porte facility. That value is reflected in the APA as the $1.5 million paid by the Buyer at closing to an escrow account, and those amounts would be released to the Seller upon satisfaction of the holdback contingency. Groten testified that Lummus's intent was the $1.5 million "covered the value of having an operating demonstration plant at Braskem La Porte without the environmental liabilities of prior occupants." Also included in the $1.5 million was technical documentation essential for operating the demonstration unit, data associated with past operation of the demo unit, catalysts that embodied the IP in a physical form, and all of those "constituted . . . a demonstration unit capable of operating at Braskem La Porte."

According to Groten, Lummus knew what was included in the demonstration unit capable of operating at the Braskem facility "through a combination of on-site inspection, plus information provided to us in a data room, . . . then subsequently the same information . . . that was there for the Siluria ABC negotiations." Groten explained that under the APA, Lummus viewed it as holistic, and the only reason anything from Siluria Tech was at Braskem was for demonstrating the technology; thus, everything there "constituted an integral to [sic] and part of the demonstration unit." He explained that Lummus had "expertise in what pilot plants and demonstration units should look like[.]" Groten listed what they expected to see in

17

the data room, including computers, analytical equipment, operating instructions, startup, shutdown, emergency operating procedures, safety equipment, catalysts "any parts of the physical components to the demonstration unit" were included in an exhibit to the APA, which was "written in a way to be as comprehensive as possible." Groten testified that there was a "fixed asset detail" attached as an appendix to the APA, and all the assets encompassed at that Braskem site fell under the umbrella of the "demonstration unit." Groten testified this was because those items listed were "essential to make . . . a demonstration that's capable of operating" safely at the Braskem La Porte Chemical Plant. Groten testified that "demo plant LPT" on the fixed asset detail spreadsheet attached to the APA refers to assets that are subsets of the demonstration unit located at the Braskem La Porte facility and felt if they removed any item within that asset class, they began removing the demonstration unit.

Groten discussed Lummus's letter to the Escrow Agent demanding return of funds dated on January 9, 2020, because 1) they had begun to remove, and 2) they were not going to enter a lease on the terms provided for in the Escrow Agreement and APA with Braskem. Lummus was not getting the value assigned to the demonstration unit, and by then, they knew Braskem would not enter a lease with them under the terms embedded in the Escrow Agreement and APA, so they had begun removing the demonstration unit. After Lummus sent its letter, Siluria ABC

18

challenged it with their own letter to the Escrow Agent, because according to Groten, Siluria ABC "created an arbitrary threshold that they said [Lummus] had not met in beginning to remove the demonstration unit." Groten reasoned that the negotiated language "to begin removal" was a low threshold, and Siluria ABC "suggested that the activities that we had taken to make the unit not capable of operating and removing what we could did not meet that threshold of beginning to remove[.]" Groten testified the APA does not say that the demonstration unit is a four-story structure; this was because "the structure is only a component of it, and it was not identified as a separate asset on the balance sheet of Siluria Tech." Lummus eventually removed the entire demonstration unit from Braskem at a cost of $502,000.

### Ian Rubin's Testimony

Ian Rubin ("Rubin"), Braskem's director of business development strategic growth projects, testified that Braskem hosted Siluria Tech as a tenant, and Siluria Tech built a "demo plant" at their La Porte site. Rubin testified about a new lease with Lummus and explained that Braskem's lease with Siluria Tech was below market and "was very unattractive to Braskem America, and we had no interest in continuing on the same terms." Rubin testified that in September 2019, Braskem had a video conference with Lummus and made it clear that Braskem would not engage in lease negotiations unless it was "on a market basis."

Braskem believed it would take three months to remove the unit entirely, and the process requires expertise. Rubin testified that when the demonstration unit was operating, someone was always in the control room monitoring it to make sure it operated safely. Rubin testified it would take heavy machinery to remove it and would be a big, time-consuming job.

He said that Lummus could only come onto Braskem's premises to get their items with permission. Rubin testified that Lummus came to Braskem on October 2, 2019, to remove computers and tools and again on November 5, 2019, to retrieve other items. In early December 2019, Lummus requested permission to have their third-party contractor come onsite to inspect the demo plant. Rubin responded on December 2, 2019, that per Braskem's legal team, they could not interact with Lummus because one of Siluria Tech's shareholders had sued over the sale of the assets, and Braskem wanted an indemnity agreement from Lummus before they allowed them back on the premises, which they did not execute until April 2020.

**William Trento's Testimony**

William Trento ("Trento") is a senior vice president for Sherwood Partners, which is a "small business advisory firm." He explained that their work deals with companies experiencing financial distress, and he takes insolvent companies through some type of insolvency proceeding, "like an Assignment for the Benefit of Creditors." In May 2019, Siluria Tech engaged Sherwood Partners to act as a

20

fiduciary in the ABC process. Sherwood Partners formed a "special purpose entity[,]" which was "Siluria (Assignment for the Benefit of Creditors) LLC." Siluria Tech then assigned all its assets to Siluria ABC, and Sherwood Partners' job was "to protect, manage, and ultimately liquidate those assets to generate as much as cash" as possible and return it to the creditors. There is no mandated deadline for completing the ABC process and usually, the process lasts more than six months, but the sales process lasts thirty to sixty days.

Trento understood that Siluria Tech had developed new technology to convert natural gas to other more valuable products, like ethylene, through chemical catalysts, but he did not have a detailed understanding about how the process worked. He testified that the ABC process did not require him to have a detailed understanding of an insolvent company's business. Their goal is always to maximize the assets' value, and they hire back former employees from various aspects of the business, in this case technical people who knew the most about the intellectual property. In this case, Siluria ABC hired former Siluria Tech employees including finance people, CEO and COO Erik Scher, and Chief Technology Officer Guido Radaelli. The finance team from Siluria Tech told them generally that the assets included intellectual property, fixed assets in California, and a facility in Texas, which they had to liquidate. In May 2019, those assets were assigned to Siluria ABC, which began marketing them by developing a target list of potential buyers.

21

The sales memo described "a first-of-its-kind commercial demonstration plant co-located with the Braskem operating polypropylene plant in La Porte, Texas," and Trento said he believed the phrase "commercial demonstration plant" to be "the lease facility in Texas where the Siluria assets were located." Trento testified the assets located in the demonstration plant included "that large four-story structure, the demonstration unit that we have seen so many pictures of, and then other miscellaneous assets that were located in the remote office: the employees' computers and papers and spare parts and such." He testified that the four-story structure was the largest asset at Braskem's facility and identified that as the "demonstration unit." He testified that it was partially self-contained, but "it's certainly connected to the Braskem plant through Braskem's piping, and it's connected to Braskem's control room through wires and piping and such."

Trento testified that during the asset marketing process, he did not really understand how the demonstration unit worked or know what items were necessary to operate it. He had never seen the demonstration unit or control room in person and had not been to the Braskem site. Trento testified he did not know if the spare catalyst was a critical component required to make the demonstration unit work or how often they had to be changed. Trento testified that although he did not know everything needed to operate the demonstration unit, "I know you need the control room, . . . the pieces." He understood that in the control rooms, computers and

programs run the physical demonstration unit, but here, it was Braskem's control room. Even so, Trento did not know what the computers, tools, and parts Lummus removed were used for.

Trento was the one primarily handling the negotiations for Siluria ABC, and his main contact was Groten, but he also spoke with an attorney from Lummus. In late May 2019, he had a conference call with Groten and discussed the demonstration unit, who later sent over notes summarizing the call. Trento believed that when Groten's notes mentioned "demo plant La Porte[,]" he was referring "to the lease facility in Texas where the Siluria assets were located." He then differentiated between that and the "demo unit asset," explaining that he believed Groten meant "the large four-story structure." Nevertheless, Trento testified they did not discuss which items were critical to the demonstration unit's operation nor did anyone from Lummus tell Trento they defined "demonstration unit" to include all Siluria ABC's assets at the La Porte facility. Trento testified that Groten's notes from the conference call also referenced a post-close price adjustment. He explained that Groten was concerned if they could not get a lease with Braskem, it would cost $1.5 million to remove the large structure from Braskem. Trento testified that he initially thought Groten's estimate seemed high but ultimately determined it was reasonable based on the need for heavy equipment and that it was "a large structure" and "a big process" to remove. Trento denied that Groten told him during the conference call

23

that Lummus believed the $1.5 million represented the value of an operable demonstration unit. Trento testified that in a petrochemical plant the removal process includes contemplating removal through physical removal of the assets. Even so, Siluria ABC believed that "begin removal meant getting cranes out there and torches or wrenches or whatever to begin dismantling this big unit[;]" that was their intention.

Trento told the jury that after the May 2019 conference call, Lummus submitted its offer, and Sherwood sent a standard APA to them, which Lummus marked up. According to Trento, before Siluria ABC entered the agreements with Lummus, they did not perform any due diligence on Lummus and cared only about maximizing return to creditors, so they went with whoever was willing and capable of buying the assets. The parties ultimately agreed to a final APA.

Consistent with Groten's testimony, Trento understood that the $1.5 million escrow fund referenced the holdback in the APA, and the two events identified in the Escrow Agreement sections 3(a) and (b) are the same as the conditions outlined in the APA section 2.1. Trento said Siluria ABC agreed to the holdback because if Lummus could not get a new lease with Braskem and had to remove the demonstration unit, it would be expensive. So, they felt it was reasonable if it cost that much to move it.

24

Trento said that Section 3 of the Escrow Agreement addressed the events related to the holdback contingency. He testified that the first event required for Siluria ABC to get the money was that Lummus and Braskem enter a lease agreement and site services agreement "to be able to operate the demonstration unit at Braskem's La Porte facility" in accordance with the requirements set forth in Section 2.1 of the APA. Trento testified that to meet the first condition for Siluria ABC to get the holdback, the demonstration unit must be able to operate, which was written in the Escrow Agreement. He added that the second condition for Siluria ABC to get the money was that "Buyer has not begun removing the demonstration unit from Braskem's facility." He agreed that neither the Escrow Agreement nor APA used the language "four-story structure" and that the contract did not say the $1.5 million was for removal costs.

Trento testified that the phrase "demonstration unit" is undefined in the agreements, which he regrets, although he conceded that the contract should be interpreted according to industry custom and practice. He explained the parties did not define it because it was understood to be the four-story structure, and Siluria ABC intended the phrase "demonstration unit" as used in the agreements to mean "this large four-story structure" that would be "difficult" and "expensive to remove." Siluria ABC's intent when they used the phrase "begun removing the demonstration unit" was that Lummus would attempt to negotiate a lease with Braskem over a

25

matter of weeks or "a month or two" and if not, they would bring in a company with cranes and start removing it. He said they agreed to the six-month timeline, because ABCs always want the money as quickly as possible; here they were willing to wait six months but did not want to go beyond that so they could maximize value and get the money to the creditors as soon as possible. Trento testified that at first, Siluria ABC wanted Lummus to be required to complete the demonstration unit's removal to receive the escrow fund, but Groten resisted. Groten suggested removing the demonstration unit was a big process and while they might move most of it in six months, he thought it was possible they would have a "little left," which made sense to Siluria ABC. Trento testified that the Escrow Agreement did not require Lummus to complete the removal of the demonstration unit by January 15, 2020, although Siluria ABC had every opportunity to put that in the contract, rather Lummus only had to begin removal.

Once the parties signed the agreements, Siluria ABC immediately transferred the assets to Lummus and then waited for the $1.5 million holdback. Trento testified that Lummus did not notify them in October or November 2019 it had begun removing the demonstration unit. He said they finally heard from Lummus about the holdback in January 2020, when Lummus sent a letter to their firm and the Escrow Agent. When Trento read Lummus's letter, he did not believe that Lummus satisfied the conditions and was entitled to the escrow fund. He specifically pointed to the

26

following language in Lummus's letter: "Because of Braskem's unwillingness and delay to enter into any lease agreement with respect to the demonstration unit, Lummus was forced to . . . begin the removal process for assets related to the demonstration unit from Braskem's La Porte facility." Trento explained that language shows Lummus began "the removal process for assets related to the demonstration unit, but not the demonstration unit itself." Trento testified that Siluria ABC believed that Lummus had not begun removing the demonstration unit by January 15, 2020, based solely on Groten's letter.

Trento said Siluria ABC responded with their own letter in January 2020 and requested the holdback. Trento testified that Siluria ABC would never agree to the $1.5 million if it knew the demonstration unit included every asset belonging to Siluria ABC at the La Porte facility, and it would be unreasonable to grab a computer and get that money; the $1.5 million was specifically for "removal of the demonstration unit." The parties discussed that the demonstration unit as a large structure that would require cranes, otherwise, it would be "so one-sided" and not something they would do, as it is "not maximizing value for the creditors." Only after Siluria ABC disputed Lummus's right to the holdback, did Trento begin emailing Braskem to determine whether Lummus removed anything from the demonstration unit and emailing Scher to determine whether Siluria Tech documents

27

defined the demonstration unit and whether the items Lummus removed were included in it.

In March 2020, Groten sent a letter to Trento regarding the holdback and detailed the property they removed, along with describing that Lummus had tried to hire contractors. Trento did not dispute the letter's accuracy or that the items described were removed.

**E. Jury Charge, Verdict, Attorney's Fees, Post-Verdict Motions, and Final Judgment**

During the charge conference, Lummus objected to an instruction that Siluria ABC proposed regarding a bona fide attempt to complete an action as commenting on the weight of the evidence. Siluria ABC agreed to withdraw that proposed instruction. Thereafter, neither party objected to Question 1, which incorporated the trial court's ambiguity instruction.[3, 4] The sole question submitted to the jury and its response was:

> Did Lummus Technology, LLC begin removing the demonstration unit from Braskem America, Inc.'s facility by January 15, 2020?

---

[3]The trial court granted Siluria ABC's motion for directed verdict on Lummus's affirmative defense of impossibility based on Braskem's refusal to let them onsite. Lummus requested a submission of a second question on its affirmative defense of impossibility, which the trial court denied.

[4]It should be noted that in pretrial filings Siluria ABC submitted a proposed "ambiguity instruction," which was similar or substantially the same as contained in the sole question submitted to the jury.

In determining the meaning of the Escrow Agreement, you must determine the intent of the parties at the time of the agreement. Consider all of the facts and circumstance surrounding the making of the agreement, the interpretation of the agreement by the parties, and the conduct of the parties.

Answer "Yes" or "No."

ANSWER: <u>YES</u>

Consistent with the parties' Rule 11 Agreement, Lummus submitted evidence of attorney's fees to the trial court by affidavit after the trial. Lummus argued it was entitled to attorney's fees under Texas Civil Practice and Remedies Code section 37.009 governing declaratory judgments, and claimed it was unnecessary to segregate since the breach-of-contract work and declaratory judgment claims were "inextricably intertwined." Lummus's evidence supporting its attorney's fees included affidavits from attorneys and billing invoices. Lummus sought to recover attorney's fees through trial of $672,571.35 and attorney's fees if Siluria ABC appealed. Siluria ABC filed its Objection to Lummus's Failure to Segregate Attorneys' Fees and Response to Lummus's Motion to Determine Amount of Prevailing Party's Attorneys' Fees. It objects to Lummus's failure to segregate, complains that Lummus's fees were unreasonably high, asserts that Lummus's fees and expenses should not exceed $547,622.00, and argues Lummus is not entitled to conditional appellate attorney's fees. Siluria ABC supported its Response with counsel's affidavit. Lummus filed a Reply in Support of Motion to Determine

Amount of [Its] Attorneys' Fees again asserting that it need not segregate its fees and that its fees were reasonable.

The trial court's Final Judgment incorporated the jury's findings and declared that Lummus was entitled to recover the full amount of the escrow fund because it met the conditions required for recovery of such funds under the Escrow Agreement. The trial court awarded Lummus: $1,495,543.10 from the court's registry;[5] attorney's fees of $467,144.50 through trial; conditional appellate attorney's fees of $40,000.00 if Lummus prevails in the intermediate court of appeals; conditional appellate attorney's fees of $15,000.00 if a petition is filed with the Texas Supreme Court and Lummus prevails; and conditional attorney's fees of $35,000.00 if the Texas Supreme Court grants a petition or full briefing is required and Lummus prevails. The trial court also awarded post-judgment interest.

Siluria ABC filed its Motion to Disregard Jury Finding and for Judgment Notwithstanding the Verdict, arguing that the Escrow Agreement was unambiguous and should be construed as a matter of law, thus the jury's finding is immaterial. It also contends that Lummus's interpretation was unreasonable. Siluria ABC also filed a Motion for New Trial arguing the jury's answer was against the great weight

---

[5]This reflects the net amount after the Escrow Agent's fees were deducted before the funds were deposited into the trial court's registry.

and preponderance of the evidence. The trial court denied both motions. Siluria ABC timely appealed.

## II. ISSUES ONE, TWO AND THREE: CONTRACT INTERPRETATION

In issues one through three, Siluria ABC complains that the trial court should have interpreted and determined that the Escrow Agreement was unambiguous as a matter of law, and thus the trial court erred by submitting a question of law to the jury, which was harmful. Lummus responds that Siluria ABC failed to object to the jury charge and has waived its complaints about any submission to the jury. Siluria ABC counters in its reply that as a question of law, the submission was immaterial, thus it was not required to object.

## A. Standard of Review and General Principles of Contract Law

"Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010) (citation omitted); *see also Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (citation omitted). We review issues of contract construction under a de novo standard. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). When discerning the parties' intent, we examine the entire agreement, giving effect to each provision so that none is rendered meaningless in the context in which they were written. *See Bd.*

*of Regents of Tex. Univ. Sys. v. IDEXX Laboratories, Inc.*, 691 S.W.3d 438, 444–45 (Tex. 2024).

"We must give effect to the parties' intentions, as expressed in their agreement," and "[w]e will give a contract language its plain, grammatical meaning unless it would clearly defeat the parties' intentions." *Barrow-Shaver Res. Co.*, 590 S.W.3d at 479 (citations omitted). "Whenever possible, courts must assess adverse arguments and resolve a text's meaning as a matter of law." *U.S. Polyco v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 389 (Tex. 2023). The Texas Supreme Court has cautioned us against considering parties' subjective intent when resolving a contract's meaning. *See id.* Usually, the instrument alone will be deemed to express the parties' intent, since it is objective, not subjective, intent that controls. *See id.* at 387 (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). Thus, an unambiguous contract will "be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023) (citation omitted) (stating same in context of oil and gas leases). The objective intent as expressed in the agreement controls the construction of an unambiguous contract, "not a party's after-the-fact conduct." *In re Dillard Dept. Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding) (citing *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000)).

Just because the parties disagree over a meaning does not make a contract ambiguous. *See IDEXX Laboratories, Inc.*, 691 S.W.3d at 443. "If the contract is subject to two or more reasonable interpretations *after* applying the pertinent rules of construction, however, the contract is ambiguous, creating a fact issue on the parties' intent." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018) (citation omitted) (emphasis added); *see also IDEXX Labs., Inc.*, 691 S.W.3d at 445 ("A limited examination may yield reasonable, conflicting interpretations, but only when one interpretation does not clearly emerge as correct after a full examination is a contract ambiguous and the determination of its meaning left to a jury.").

One rule of contract construction is that when terms are undefined, we give them their plain meaning. *See Simien*, 674 S.W.3d at 257 (quoting *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.2d 228, 236 (Tex. 2022)). "To determine the common, ordinary meaning of undefined terms used in agreements, 'we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities.'" *OHAH, Ltd. v. LNG Builders, LLC*, No. 09-20-00292-CV, 2022 WL 16986573, at *10 (Tex. App.—Beaumont Nov. 17, 2022, pet. denied) (mem. op.) (quoting *Tex. State Bd. of Examiners of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)).

33

**B. Analysis**

Although the Escrow Agreement contained two contingencies, the parties do not dispute that Lummus was unable to obtain a lease with Braskem to be able to operate the demonstration unit at its La Porte facility. So, the first contingency is not at issue. The only condition at issue here is over Section 3(a)(ii) of the Escrow Agreement which provides that Seller is entitled to the 1.5 million if by:

> The sixth (6th) month anniversary of the Closing (as defined in the Purchase Agreement) if, by such date, Buyer has not begun removing the demonstration unit from Braskem's facility.

Otherwise, Buyer is entitled to the holdback. January 15, 2020 is the six month anniversary. By January 15, 2020, had Lummus "begun" removing the "demonstration unit" from Braskem's facility. That is the sole issue.

For there to be an ambiguity, both parties' advocated interpretations would need to be reasonable, after we apply principles of contract construction. *See IDEXX Labs., Inc.*, 691 S.W.3d at 445; *Koopmann*, 547 S.W.3d at 874. Siluria ABC contends its desired interpretation of "demonstration unit" is reasonable but that Lummus's suggested interpretation is unreasonable. Therefore, Siluria ABC argues there is no ambiguity. Siluria ABC's corporate representative, Trento, testified at trial that "demonstration unit" was undefined in the contracts, which he regrets. Likewise, the term "begun" is undefined. Since the terms are undefined in the contract, we give them their plain meaning, looking first to their dictionary

34

definitions. *See Simien*, 674 S.W.3d at 257; *Perthuis*, 645 S.W.3d at 236; *OHAH, Ltd.*, 2022 WL 16986573, at *10.

"Begun" is the past tense of the verb "begin," which is defined as "to do the first part of action" or "go into the first part of a process." https://merriam-webster.com/dictionary/begun (last visited Mar. 3, 2025). "Demonstration" is defined as "an act, process, or means of demonstrating to the intelligence," or "a showing of the merits of a product or service to a prospective customer." https://merriam-webster.com/dictionary/demonstration (last visited Mar. 3, 2025). "Unit" is defined as "a single thing, person, or group that is a constituent of a whole" or "a piece or complex of apparatus serving to perform one particular function." https://merriam-webster.com/dictionary/unit (last visited Mar. 3, 2025). Giving these words their plain meaning, the "demonstration unit" is a single thing or group that is a constituent of a whole, or a piece or complex of apparatus serving to perform (1) an act, process or means of demonstrating, or (2) show the merits of a product or service to a prospective customer. Using the plain language to define "demonstration unit" references that the unit demonstrates or shows the merits of a process, product or service. To show the OCM process or to demonstrate the OCM process would require the demonstration unit to operate or be operable and it cannot operate without its computers and materials. The other contingency in the Escrow Agreement, as stated in section 3(a)(i), was that if Lummus failed to enter a lease and site services

agreement, in accordance with the APA, with Braskem "to be able to operate the demonstration unit at Braskem's LaPorte facility." This is informative, as the express purpose of the lease with Braskem was "to be able to operate the demonstration unit" there, which supports the parties' intent that the unit be operable. Nothing in the language of the Escrow Agreement or the APA limits the definition of the demonstration unit to the "four-story structure" or to only the bolted attachments that Siluria ABC advocates. Rather, the language supports the parties' intent that the demonstration unit be operable, and that Lummus was required to begin to take the first steps in the process to remove it.

Applying principles of contract construction by giving undefined terms their plain, ordinary meaning as read in context shows a single reasonable interpretation emerges, and it is the definition Lummus advocates. *See IDEXX Labs., Inc.*, 691 S.W.3d at 443–44. Therefore, we conclude the agreement is unambiguous. *Cf. Koopmann*, 547 S.W.3d at 874 (explaining that if a contract is subject to two or more reasonable interpretations after applying rules of construction, it is ambiguous). These were sophisticated parties in an arm's-length transaction. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 484 (explaining provision at issue was "a bargained-for exchange" between sophisticated party). Trento and Groten, both engineers and with the assistance of counsel, exchanged and edited drafts of the agreement, which included adding the "begun removal" language that made it into the final agreement.

36

Thus, the surrounding circumstances establish that the "begun removal" provision "was a bargained-for exchange between the parties." *Id.* (citation omitted). "But those are the only facts and circumstances we can consider without delving into the parties' intent beyond what their agreement plainly yields." *Id.* (citation omitted). The unambiguous provision controls, thus we do not consider extrinsic evidence that varies the agreement. *See id.* By removing components such as computers and catalysts that would have rendered the demonstration unit inoperable, Lummus had "begun removal." If the parties felt a higher or specific threshold was required, they were free to negotiate that and include it in the Escrow Agreement.

Again, Siluria ABC contends that it did not need to object to the court's charge, because the question submitted to the jury was immaterial. Implicit in the trial court's decision to submit the question to the jury was its determination that the contract was ambiguous. *See Sifuentes v. Carrillo*, 982 S.W.2d 500, 505 (Tex. App.—San Antonio 1998, pet. denied); *see also Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993). As discussed above, we agree that the contract at issue was unambiguous. Since the trial court failed to construe that the contract was unambiguous as a matter of law, it erred in submitting the question to the jury. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 480; *Grohman v. Kahlig*, 318 S.W.3d 382, 887 (Tex. 2010). "A question is immaterial when it should not have been submitted," and a question "beyond the province of the jury, such as a question

of law, may be deemed immaterial." *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). Siluria ABC correctly argues that the trial court's question submitted to the jury was immaterial. *See id.*

Siluria ABC did not object to the jury charge. Even so, "a complaint that a jury's answer is immaterial is not a jury charge complaint." *Musallam v. Ali*, 560 S.W.3d 636, 640 (Tex. 2018) (citing *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017)). Thus, a party need not object to a jury question to later argue it is immaterial. *Id.*; *Red Deer Res.*, 526 S.W.3d at 402. Siluria ABC preserved error on the immateriality issue by raising this concern in a post-verdict motion for judgment notwithstanding the verdict. *See Musallam*, 560 S.W.3d at 640; *Red Deer Res.*, 526 S.W.3d at 402. That said, the erroneous submission of an unambiguous contract to the jury is harmless if the jury found as the trial court should have found. *See* Tex. R. App. P. 44.1 (outlining standard for reversible error); *Barrow-Shaver Res. Co.*, 590 S.W.3d at 480; *Grohman*, 318 S.W.3d at 887 (citation omitted); *Spencer*, 876 S.W.2d at 157. Since the jury here determined that Lummus had begun removing the demonstration unit by January 15, 2020, which is what the trial court should have determined when construing this unambiguous agreement, any error in submitting Question 1 to the jury was harmless. *See* Tex. R. App. P. 44.1; *Barrow-Shaver Res. Co.*, 590 S.W.3d at 480; *Grohman*, 318 S.W.3d at 887 (citation omitted); *Spencer*, 876 S.W.2d at 157.

We overrule issues one through three.

## III. ISSUE FOUR: FACTUAL SUFFICIENCY

In its fourth issue, Siluria ABC challenges the factual sufficiency of the evidence by complaining that the jury's verdict was against the great weight and preponderance of the evidence. Even if the contract here required the jury to decide a disputed fact issue, the evidence was factually sufficient to support the jury's verdict for the reasons discussed below.

### A. Standard of Review and Applicable Law

In a legal sufficiency challenge of a jury's verdict, we view all the evidence in the light most favorable to the verdict. *See Westwood Motorcars, LLC v. Virtuolotry, LLC*, 689 S.W.3d 879, 885 (Tex. 2024); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 810 (Tex. 2005). We reverse "only if there is a complete absence of evidence proving a vital fact, the rules of law or evidence bar the court from weighing the only evidence proving a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively disproves the existence of a vital fact." *Westwood Motorcars*, 689 S.W.3d at 885–86 (citing *City of Keller*, 168 S.W.3d at 807, 810). That said, on appeal, Siluria does not challenge the legal sufficiency of the evidence supporting the jury's verdict, but only the factual sufficiency of the evidence. In a factual sufficiency review of a jury finding on which the appellant does not have the burden of proof, we examine "all the

39

evidence and will set aside the verdict only if the evidence is so weak that it is clear the verdict is wrong and unjust." *Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 512 (Tex. App.—Beaumont 2003, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986)). In a factual sufficiency review, we do not substitute our judgment for the jury's. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury is the sole judge of the witnesses' credibility and weight to be given their testimony. *See id.*

**B. Analysis**

Again, Groten testified that he intentionally negotiated the requirement that they begin removal of the unit rather than complete it, which was a very low threshold. Trento and Groten both testified that Siluria ABC sent the initial draft of the APA, the parties exchanged redlines, including adding the "begun removal" language, which Siluria ABC ultimately agreed to. Groten described the removal process and testified that they began by removing easily "moveable" items like computers, and the OCM catalysts that were necessary to the demonstration unit's operation. Groten also testified that before January 15, 2020, Lummus contacted three third-party contractors with the skill set to complete removal and attempted to get them on Braskem's site.

Trento testified that he did not know how the catalysts or computers were necessary to the demonstration unit and the OCM process. He did acknowledge that

40

the four-story structure was connected to the "control room through wires and piping and such." Trento testified that all Lummus had to do was begin removing the unit, and he added that in a petrochemical process this includes when you contemplate removal up through physical removal of the assets. Although he later testified that Siluria ABC believed "begin removal meant getting cranes out there[,]" which was their intent. Trento testified that he did not know everything needed to operate the demo unit, but testified, "I know you need the control room, . . . the pieces." Additional evidence showed that on January 17, 2020, Trento and Siluria ABC disputed Lummus "had begun" removing the demonstration unit; however, Trento was still asking others whether Lummus had begun the removal process, which seemed to show Siluria ABC disputed this without having knowledge of the removal status.

Although the parties gave conflicting testimony about the meaning of "demonstration unit" and "begun" or "begin removing" in the contract and their intent, the jury was free to judge the witnesses' credibility and decide the weight, if any, to give the testimony. *See id.* For these reasons, we cannot say that the jury's verdict was against the great weight and preponderance of the evidence or clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Keen*, 117 S.W.3d at 512.

We overrule issue four.

## IV. ISSUE FIVE: ATTORNEY'S FEES

In issue five, Siluria ABC contends the trial court erred by awarding Lummus's attorney's fees for failure to segregate and that Lummus was not entitled to attorney's fees for its breach of contract claim as an LLC.

### A. Standard of Review and Applicable Law

"We review section 37.009 fee awards under an abuse-of-discretion standard." *Transcor Astra Grp., S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). "It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, or without regard to guiding legal principles ... or to rule without supporting evidence." *Id.* (citations omitted).

In a declaratory judgment proceeding, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Generally, attorneys are required to segregate their recoverable fees from fees that advance non-recoverable claims. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311–12 (Tex. 2006). The exception is that if "legal services advance both a recoverable and unrecoverable claim that . . . are so intertwined they need not be segregated." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (2017); *see also Chapa*, 212 S.W.3d at 311–12.

**B. Analysis**

Here, the parties agreed to submit evidence of attorney's fees to the trial court via affidavit post-trial. Lummus submitted detailed affidavits outlining their work, attaching fee invoices, and explaining why the declaratory judgment claims and breach of contract claims were so intertwined they need not be segregated. Siluria ABC challenges Lummus's failure to segregate their fees. However, Siluria ABC's own attorney fee expert was also of the position that the declaratory judgment claims and breach of contract claims were so intertwined they need not be segregated, which corroborated Lummus's position. Finally, the record establishes that the parties sought competing declaratory judgments interpreting the contract and their rights and duties under the contract, which is an allowable declaratory judgment claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (allowing for parties to seek a declaration regarding a contract's construction or their rights under a contract, among other things).

The only fees arguably subject to segregation would have been work done in response to the Escrow Agent's interpleader action. Yet the record establishes that the parties performed little work on the interpleader action, which included filing an answer and the parties' agreed motion to interplead the funds and dismiss the Escrow Agent. The record reflects that the Escrow Agent initiated the lawsuit in March 2021 and by May 2021, the Escrow Agent had been dismissed from the case. Given the

brief period the parties dealt with the interpleader action, those fees would have been comparatively small.

The evidence shows that Lummus sought $672,571.35 in fees, but Siluria ABC claimed that Lummus's fees and expenses should not exceed $547,622.00; however, the trial court discounted Lummus's fees to $467,144.50, reducing them by 30.6%. Based on this discount and how intertwined the breach of contract and declaratory judgment claims were, we cannot say the trial court abused its discretion by not requiring further segregation. *See Transcor Astra Grp.*, 650 S.W.3d at 482; *Bocquet*, 972 S.W.2d at 21; *see also Chapa*, 212 S.W.3d at 311–12.

We overrule issue five.

## V. CONCLUSION

Having overruled Siluria ABC's issues necessary to the resolution of this appeal, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on February 27, 2025
Opinion Delivered March 20, 2025

Before Golemon, C.J., Johnson and Wright, JJ.

44